### In re ALTERNATE FUELS, INC., Debtor.

**Christopher John Redmond, Chapter 11 Trustee, Plaintiff–Appellee,**

v.

**Cimarron Energy Company LLC, Defendant,**

and

**William Karl Jenkins, also known as W.K. Jenkins, doing business as Green Acres Farm, and M. Earlene Jenkins, doing business as Green Acres Farms, Defendants–Third–Party Plaintiffs–Appellants,**

v.

**Larry Pommier and Michael Christie, Third–Party Defendants.**

BAP No. KS–12–110.
Bankruptcy No. 09–20173.
Adversary No. 11–06026.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

Filed March 18, 2014.

Jonathan Sternberg of Jonathan Sternberg, Attorney, P.C., Kansas City, MO (William M. Quitmeier and Kelly D. Malm of The Quitmeier Law Firm, Kansas City, MO, with him on the brief), for Defendants–Third–Party–Plaintiffs–Appellants.

P. Glen Smith (Christopher J. Redmond, pro se, with him on the brief) of Husch Blackwell LLP, Kansas City, MO, for Plaintiff–Appellee.

Before THURMAN, Chief Judge, CORNISH, and MOSIER [1], Bankruptcy Judges.

MOSIER, Bankruptcy Judge.

■ Recharacterization is an equitable remedy that allows courts to ignore a party's characterization of a transaction and, instead, give effect to the transaction's actual substance. In bankruptcy cases, under certain circumstances, a transaction labeled as a loan may be recharacterized as an equity investment. In this case, William Karl Jenkins (Jenkins) and his wife Earlene Jenkins appeal the bankruptcy court's determination that funds they advanced should not be considered a loan but should be treated as an equity investment. Although recharacterization is an unusual remedy, given the unique facts of this case, we affirm the bankruptcy court's conclusion that any funds the Jenkinses advanced to Alternate Fuels, Inc. (AFI)

should be treated as an equity investment. The Jenkinses also appeal the bankruptcy court's alternative findings and conclusions that they did not sustain their burden of proof as to the validity and amount of their claims, and that any secured claims they may have should be equitably subordinated. We also affirm the bankruptcy court's decision on those issues.[2]

## I. FACTUAL BACKGROUND

Jenkins was not a stranger to coal mining and surface restoration and, in 1999, became aware of an opportunity in connection with AFI. AFI originally filed a Chapter 11 petition in December 1992. While AFI was successful in obtaining confirmation of a plan of reorganization, it was less successful in operating under the plan and, in 1996, AFI ceased mining operations. The Chapter 11 trustee who was operating the reorganized debtor abandoned the debtor's assets and resigned. AFI's secured creditors foreclosed on the equipment that was collateral for their loans and AFI remained liable for debts that were not discharged in its original Chapter 11 case. AFI's only remaining assets after that were mining permits.

Through a series of events that are not entirely clear, but are also not important, an individual by the name of John Warmack acquired all of AFI's stock. Warmack also formed Cimarron Energy Co. and held 99% of its stock. The other 1% was held by Larry Pommier, who had been hired by the Chapter 11 trustee to work for AFI. Cimarron acquired the equipment

---

1. Honorable R. Kimball Mosier, United States Bankruptcy Judge, United States Bankruptcy Court for the District of Utah, sitting by designation.

2. Appellee Redmond filed a motion to strike certain exhibits designated by the Appellants from the appellate record, which was referred to this panel for its consideration. Although this Court always endeavors not to consider documents it deems irrelevant, whether or not they are included in the appellate record, having considered the parties' memoranda in support and opposition to the motion, the motion is hereby denied.

that was previously owned by AFI and commenced mining operations.

In order to continue mining operations, Warmack and Cimarron provided new reclamation bonds to the State of Missouri. The reclamation bonds were required to assure that AFI would reclaim, or restore, the permitted sites after mining operations were completed. Although the reclamation bonds obligated AFI to complete reclamation, the twenty-four certificates of deposit (Certificates of Deposit) securing the bonds were held by Cimarron or Warmack personally. Because Cimarron conducted the mining operations and owned the equipment, the equipment and the Certificates of Deposit were insulated from AFI's creditors.

In 1999, Pommier informed Jenkins that Warmack was looking to liquidate his interest in AFI. Warmack had completed his mining efforts, but AFI was still obligated to reclaim the permitted mining sites. Through the acquisition of Warmack's interest in AFI, Cimarron, and the Certificates of Deposit, Jenkins saw an opportunity to obtain Cimarron's equipment and, after successful reclamation of the permitted mining sites, the Certificates of Deposit.

On December 6, 1999, Jenkins and his wife entered into an agreement to purchase all of Warmack's interest in AFI and Cimarron. Because Jenkins was listed on the Federal Office of Surface Mining's Applicant Violator System, he was prohibited from owning stock of a surface coal mining company. To get around this obstacle, Jenkins arranged for ownership of the AFI stock to be placed in the name of Michael Christie, who was a mere straw man for the Jenkinses. Christie had no significant involvement with AFI or Cimarron. The purchase also included the

assignment of the Certificates of Deposit in the total face amount of $1,377,000. The Jenkinses paid Warmack $549,250. Pursuant to the purchase agreement, Warmack used the funds to pay down secured debts on the equipment owned by Cimarron.

Even though AFI received no benefit from the $549,250 payment, AFI executed a promissory note in the amount of $500,000, payable to Green Acres Farms, a business name Jenkins had registered with the Missouri Secretary of State.[3] The promissory note was for a term of five years but stated that "this note shall be paid in full upon reclamation bond release from the State of Missouri. Said bonds currently being used to secure reclamation liability for Alternate Fuels, Inc. at the Blue Mound Mine." At trial, Jenkins provided copies of numerous checks beginning in the year 2000, but failed to produce any checks or other documentation specifically evidencing this alleged loan. Jenkins candidly testified that AFI had no ability to pay this note and the only source of payment would be the Certificates of Deposit. Any monies advanced by Jenkins to AFI were for the purpose of funding the reclamation process with the intent and purpose of ultimately having the Certificates of Deposit released to Jenkins. After the transaction with Warmack was completed, the Jenkinses beneficially owned 100% of AFI, 99% of Cimarron, which owned all of the mining equipment, and they owned the Certificates of Deposit. AFI was left with the permitted mining sites that were subject to reclamation and a $500,000.00 indebtedness to the Jenkinses.

Jenkins never intended to have AFI conduct any mining operations. The sole purpose of the transaction with Warmack was to obtain the proceeds of the equipment

3. *See* Promissory Note dated Dec. 6, 1999, *in* Appellants' Appendix ("Appx.") at 1556.

(which was valued between $1 to $2 million) and the release of the Certificates of Deposit following reclamation of the permitted sites. Although release of the Certificates of Deposit was contingent on AFI's satisfactory completion of its reclamation work, the Jenkinses immediately began receiving the interest payments on the Certificates of Deposit.

AFI did not recognize or follow corporate formalities such as shareholder or director meetings. Jenkins controlled all of AFI's operations, which were limited to reclamation efforts through Cimarron, and he delegated the day-to-day operations of AFI and Cimarron to Pommier. AFI had no income, and its operations were funded through checks issued by Green Acres Farms. The checks were made payable to AFI and delivered to Pommier, who then endorsed them for payment to Cimarron. There was no written agreement between AFI and Cimarron relative to the reclamation expenses or the advances, and there was no contemporaneous accounting of the advances. Specifically, there was no documentary evidence presented that the checks written to AFI and immediately endorsed for payment to Cimarron were used for reclamation expenses. The advanced funds were never subject to the claims of AFI's creditors because they were never deposited into an AFI account.

On November 6, 2000, AFI executed another promissory note, in the amount of $500,000 plus future advances, payable to Green Acres Farms.[4] The interest rate on the second note was 9%. Although Green Acres Farms advanced sums for reclamation prior to the date of the second note, Jenkins failed to provide any accounting to connect the funds advanced to the amount of the promissory note and failed to produce any checks or other documentation specifically evidencing this alleged loan. This promissory note was also for a term of five years and stated that "this note shall be paid in full upon reclamation bond release from the State of Missouri. Said bonds currently being used to secure reclamation liability for Alternate Fuels, Inc. at the Blue Mound Mine." Pommier testified that the second note was not intended to be an additional indebtedness, but to replace the first note with a lower rate of interest. Jenkins denied this assertion. As with the prior note, Jenkins knew that AFI had no prospect of paying this note and the only prospect for payment was the Certificates of Deposit.

A third note, in the amount of $1,000,000 and dated October 11, 2001, was executed by Pommier on behalf of AFI.[5] Like the prior two notes, there is no accounting that supports the amount of the third note. Again, this promissory note was for a term of five years and stated that "this note shall be paid in full upon reclamation bond release from the State of Missouri. Said bonds currently being used to secure reclamation liability for Alternate Fuels, Inc. at the Blue Mound Mine." Pommier also testified that the third note was not intended to be additional debt, but to supersede or replace the second note. Jenkins also denied this assertion and, once again, Jenkins knew AFI would not be able to pay this note.

During its reclamation efforts, Cimarron obtained an arbitration award against Mackie Clemmons Coal Company in the amount of $170,000. Pommier testified that the sums received for this arbitration award were used to pay Girard National Bank to release a lien on some of Cimarron's equipment. Pommier further testi-

---

**4.** *See* Promissory Note dated Nov. 6, 2000, *in* Appx. at 1559.

**5.** *See* Promissory Note dated Oct. 11, 2001, *in* Appx. at 1562.

fied that the Jenkinses' proof of claim sought recovery of this payment. Jenkins did not dispute that testimony, and there is a check in the amount of $170,000, dated June 30, 2000, that is consistent with Pommier's testimony.[6]

The evidence is vague regarding the liquidation of the mining equipment, but it is undisputed that the equipment, valued between $1,000,000 and $2,000,000, was liquidated. Pommier testified that Jenkins retained the proceeds, and Jenkins offered no evidence to refute that testimony. Jenkins did not offer to provide an accounting of the proceeds from the sale of the equipment.

In 2002, Jenkins and Pommier believed the reclamation process was nearly complete, but that the State of Missouri had unreasonably blocked and interfered with the reclamation. Concluding that the State would never find the reclamation fully satisfactory, AFI filed a lawsuit against Tom Cabanas and Richard Hall, officers and employees of the Missouri Department of Natural Resources.

Jenkins saw an advantage in the possibility that proceeds of the Cabanas litigation might allow AFI to pay the notes, and took it. Since Jenkins controlled AFI, he caused it to assign $3,000,000 of its potential recovery from the Cabanas litigation to the Jenkinses on March 1, 2003. On this same date, a fourth note was executed by AFI in favor of Green Acres Farms and the Jenkinses in the amount of $2,370,761.00.[7] The fourth note states that it is a renewal of the prior three notes, but makes no reference to any future advances and is not supported by any contemporaneous or prior accounting. Like the three

prior notes, this note was for a term of five years but stated that the "note shall be paid in full upon reclamation bond release from the State of Missouri *or proceeds from the lawsuit filed in Federal Court case no. 02CV1182* said bonds currently being used to secure reclamation liability for Alternate Fuels, Inc. at the Blue Mound Mine" (emphasis added). This promissory note does not reconcile with the first three notes.

The Cabanas litigation ultimately resulted in a judgment in favor of AFI against Tom Cabanas. On appeal, the judgment was affirmed, but the amount of the judgment was reduced. In September 2008, the State of Missouri satisfied the judgment by paying a little over $7,000,000 into the registry of the United States District Court for the Western District of Missouri.[8]

News of the judgment spread, and creditors of AFI began making claims against the judgment proceeds. Apparently not wanting the responsibility or potential liability associated with payment of these competing claims, Pommier opted to file a Chapter 11 bankruptcy petition on behalf of AFI on January 28, 2009. Christopher John Redmond (Trustee) was appointed as the Chapter 11 trustee.

The Jenkinses filed a proof of claim against AFI's estate in the amount of $4,336,813. The Jenkinses' claim is composed of (1) $3,823,862.92 for payment of the first three promissory notes, plus interest, secured by the assignment of $3,000,000 of the Cabanas lawsuit; (2) $487,298.62 for "money" related to reclamation; and (3) accounts for Dan Card, in the amount of $7,676.00, and Pat Miller, in

---

6. *See* Green Acres Farms Check No. 1070, *in* Appx. at 966.

7. *See* Promissory Note dated March 1, 2003, *in* Appx. at 1617.

8. The net proceeds of that amount, which are approximately $5 million after payment of costs and attorney's fees, are currently held by the bankruptcy court.

the amount of $17,975.56. The Trustee filed an adversary proceeding against the Jenkinses challenging their claim. The Trustee sought to have the Jenkinses' loans to AFI recharacterized as an equity contribution, or have their secured claims equitably subordinated or disallowed entirely.

The bankruptcy court found that the Jenkinses' claim for $3,823,862.92 for the three promissory notes should be recharacterized as equity. Similarly, the court found that the Jenkinses' claim for $487,298.62 for money related to reclamation should also be recharacterized as equity contributions rather than debt. As a result, the court set aside AFI's assignment of the Cabanas litigation proceeds because the Jenkinses no longer held an allowed claim.

Alternatively, the bankruptcy court held that the Jenkinses had not sustained their burden of proof as to the validity and amount of their claim. The bankruptcy court also alternatively found that, if the Jenkinses' claims were not recharacterized as equity or disallowed, the Jenkinses' claims should be treated as "unsubordinated, unsecured claims for the amount of the transfers," but the Jenkinses' secured claim on the Cabanas litigation proceeds should be equitably subordinated.

## II. APPELLATE JURISDICTION

The appealed order was entered by the bankruptcy court on December 10, 2012, making the notice of appeal due on Christmas Eve, December 24, 2012. The Jenkinses filed their notice of appeal on December 26, 2012. Christmas Eve is not a "defined" legal holiday in Rule 9006(a)(6)(A).[9] However, December 24, 2012 was "declared a holiday" by both President Barack Obama and the State of Kansas, and is therefore considered a holiday pursuant to Rule 9006(a)(6)(B) and (C). Since Christmas Day, December 25, is a defined legal holiday, December 26 was the next day that was neither a weekend nor a legal holiday, and the Jenkinses' notice of appeal filed on that date was timely under Rule 9006(a)(1)(C).

■ This Court has jurisdiction to hear timely filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit, unless one of the parties elects to have the district court hear the appeal.[10] None of the parties elected to have this appeal heard by the United States District Court for the District of Kansas, and they have therefore consented to appellate review by this Court. The appealed order fully resolved the parties' adversary proceeding and is therefore final for purposes of appeal.[11] An order disposing of an objection to a creditor's claim is a final order for the purposes of appeal.[12]

## III. ISSUE AND STANDARD OF REVIEW

A. Did the bankruptcy court properly recharacterize the Jenkinses' promissory notes as equity?

■ This is a mixed issue of law and fact, in which legal determinations are reviewed

---

**9.** Fed. R. Bankr.P. 9006(a)(6)(A). Unless otherwise noted, all further references to "rules" in this decision will be to the Federal Rules of Bankruptcy Procedure.

**10.** 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002; 10th Cir. BAP L.R. 8001–3.

**11.** *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 712, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996) (quoting *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 89 L.Ed. 911 (1945)).

**12.** *In re Bryan,* 407 B.R. 410, 413 (10th Cir. BAP 2009).

*de novo,* and fact findings are reviewed for clear error.[13]

B. Did the bankruptcy court err by equitably subordinating the Jenkinses' secured claims?

■ This is a mixed issue of law and fact, in which legal determinations are reviewed *de novo,* and fact findings are reviewed for clear error.[14]

C. Did the bankruptcy court properly disallow the Jenkinses' claim?

■ Whether the bankruptcy court applied the proper standard is a legal determination that is reviewed *de novo.*[15] The sufficiency of a claimant's evidence is a factual finding and is reviewed for clear error.[16]

## IV. DISCUSSION

Although the bankruptcy court could have simply disallowed the Jenkinses' claim because they failed to properly support it, the court primarily focused its analysis on recharacterization of the claims. Given the facts of this case, the bankruptcy court correctly focused on the question of recharacterization.

### A. The Bankruptcy Court Correctly Recharacterized The Jenkinses' Claims.

While disallowance or subordination of the Jenkinses' claims is proper, recharacterization is the more appropriate remedy

in this case. Because the Jenkinses beneficially owned AFI at the time of the alleged cash infusions, any "loans" from the Jenkinses to AFI may be scrutinized to ensure that they are properly characterized.

### 1. The *Travelers* and *Law* decisions do not preclude recharacterization in this case.

In reaching its conclusion that the Jenkinses' claim against AFI should be recharacterized, the bankruptcy court considered the thirteen-factor test identified by the Tenth Circuit Court of Appeals in *In re Hedged–Investments.*[17] However, the Jenkinses contend that multiple-factor tests for recharacterization, including the one in *Hedged–Investments,* were implicitly abrogated by the United States Supreme Court in *In re Travelers.*[18] In *Travelers,* the Supreme Court considered a claim by a Chapter 11 debtor's bonding company for attorney's fees it incurred in litigating issues in the bankruptcy. The bankruptcy court's disallowance of the bondholder's claim for attorney's fees was based on a rule adopted by the Ninth Circuit in *In re Fobian.*[19] In *Fobian,* the Ninth Circuit held that attorney's fees are not recoverable in bankruptcy for litigating issues peculiar to federal bankruptcy law.[20] The *Travelers* Court found that there was no support for the *Fobian* rule in the Bankruptcy Code and therefore rejected it, stating:

---

13. *Sender v. Bronze Group, Ltd. (In re Hedged–Invs. Assocs., Inc.),* 380 F.3d 1292, 1297–98 (10th Cir.2004).

14. *Id.*

15. *Pierce v. Underwood,* 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

16. *Phillips v. White (In re White),* 25 F.3d 931, 933 (10th Cir.1994).

17. *In re Hedged–Invs.,* 380 F.3d at 1298.

18. *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.,* 549 U.S. 443, 127 S.Ct. 1199, 167 L.Ed.2d 178 (2007).

19. *In re Fobian,* 951 F.2d 1149 (9th Cir.1991).

20. *Id.* at 1153.

The absence of textual support is fatal for the *Fobian* rule. Consistent with our prior statements regarding creditors' entitlements in bankruptcy, *see, e.g., Raleigh [v. Illinois Dept. of Revenue], supra,* [530 U.S. 15] at 20, 120 S.Ct. 1951 [147 L.Ed.2d 13 (2000) ], we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy *unless they are expressly disallowed. See* 11 U.S.C. § 502(b).[21]

The Jenkinses argue that *Travelers* precludes recharacterization unless recharacterization is allowed by applicable state law. They contend that Kansas law does not recognize recharacterization and, therefore, the bankruptcy court erred by applying an equitable federal doctrine to disallow their claim. Simply put, the Jenkinses assert their claim is enforceable under Kansas law and, because there is no express provision in the Bankruptcy Code that disallows it, their claim must be allowed in this case.

■ The Jenkinses also contend that the Supreme Court's recent ruling in *Law v. Siegel*[22] prohibits recharacterization.[23] They argue that § 502(b) does not give bankruptcy courts discretion to grant or withhold claims based on whatever considerations they deem appropriate. This exact argument was rejected by the Fourth Circuit Court of Appeals in *In re Official Committee of Unsecured Creditors for Dornier Aviation (North America), Inc.*[24] As that court explained:

Thus, implementation of the Code's priority scheme requires a determination of whether a particular obligation is debt or equity. Where, as here, the question

is in dispute, the bankruptcy court must have the authority to make this determination in order to preserve the Code's priority scheme. If the court were required to accept the representations of the claimant, as GMBH appears to argue, then an equity investor could label its contribution a loan and guarantee itself higher priority—and a larger recovery—should the debtor file for bankruptcy. Thus, denying a bankruptcy court the ability to recharacterize a claim would have the effect of subverting the Code's critical priority system by allowing equity investors to jump the line and reduce the recovery of true creditors. In light of the broad language of § 105(a) and the larger purpose of the Bankruptcy Code, we believe that a bankruptcy court's power to recharacterize is essential to the proper and consistent application of the Code.

GMBH contends that recharacterization does not exist independently of the bankruptcy court's disallowance power under § 502(b) or the court's equitable subordination power under § 510(c). This argument seems to be rooted in GMBH's view that recharacterization serves the same purposes and requires the same analysis as disallowance or equitable subordination. In fact, contrary to GMBH's arguments, recharacterization requires a different inquiry and serves a different function.

Disallowance of a claim under § 502(b) is only appropriate when the claimant has no rights vis-à-vis the bankrupt, i.e., when there is "no basis in fact or law" for any recovery from the debtor. When a bankruptcy court disal-

**21.** *Travelers,* 549 U.S. at 452, 127 S.Ct. 1199 (emphasis added).

**22.** *Law v. Siegel,* —— U.S. ——, 134 S.Ct. 1188, 188 L.Ed.2d 146, 2014 WL 813702 (2014).

**23.** Appellants' Statement of Supplemental Authority, *Docket No. 86.*

**24.** *In re Official Comm. of Unsecured Creditors for Dornier Aviation (North America), Inc.,* 453 F.3d 225 (4th Cir.2006).

lows a claim, the claim is completely discharged. By contrast, recharacterization is appropriate when the claimant has some rights vis-à-vis the bankrupt. That is, when a bankruptcy court recharacterizes a claim, it necessarily recognizes the existence of a relationship between the debtor and the claimant, but it determines that the relationship is one of an equity owner rather than a creditor.[25]

Recharacterization is not based on the enforceability of a claim; it is based on establishing the true substance of a transaction. It is not a determination of whether a claim should be allowed or disallowed; it is a determination of whether a claim should be treated as a claim or as an equity security interest. If a claim is disallowed, it is essentially not recognized in the bankruptcy case. If a claim is recharacterized, it is still recognized in the bankruptcy case, but is simply treated as an equity security interest.

Significantly, the *Travelers* and *Law* decisions do not deal with recharacterization at all, or even mention the *Hedged–Investments* decision. It is not implicit, and clearly not explicit, that *Travelers* or *Law* abrogated a bankruptcy court's ability to recharacterize an alleged loan. Additionally, the Jenkinses have not provided a persuasive argument that equitable recharacterization is not permissible under Kansas law.

### 2. The *Hedged–Investments* Factors Dictate Recharacterization in This Case.

The Jenkinses contend that even the *Hedged–Investments* factors com-

pel treatment of their claims as loans. In *Hedged–Investments*, the Tenth Circuit expanded the "more generally phrased test" it used in *Mid–Town*[26] in favor of a multi-factor test. The non-exclusive factors the Tenth Circuit considered were:

(1) the names given to the certificates evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date;

(3) the source of payments;

(4) the right to enforce payment of principal and interest;

(5) participation in management flowing as a result;

(6) the status of the contribution in relation to regular corporate creditors;

(7) the intent of the parties;

(8) "thin" or adequate capitalization;

(9) identity of interest between the creditor and stockholder;

(10) source of interest payments;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek a postponement.[27]

The purpose of the *Hedged–Investments* factors is to "distinguish true debt from camouflaged equity" by determining whether certain facts are more supportive of a loan or an equity transaction.[28] These factors are not dispositive of characteriza-

---

**25.** *Id.* at 231–32 (emphasis and citations omitted).

**26.** *In re Hedged–Invs.*, 380 F.3d at 1298 n. 1 (citing *Sinclair v. Barr (In re Mid–Town Produce Terminal, Inc.)*, 599 F.2d 389, 392 (10th Cir.1979)).

**27.** *In re Hedged–Invs.*, 380 F.3d at 1298.

**28.** *Id.*

tion, and their applicability and weight depend on the facts of each case in which they are applied.[29]

The *Hedged–Investments* factors should be viewed in the overall context of the disputed transactions. The Jenkinses base their claim on the three Notes and a bald statement of additional amounts advanced, but they failed to provide a reliable accounting with respect to the Notes or the additional advances. At the time the Notes were signed, there was no economic benefit or incentive for AFI to reclaim the permitted mining sites. Although AFI would discharge its legal obligation to complete reclamation, it would have to incur debt to do so. If AFI elected not to complete reclamation, the State of Missouri would look to the surety bonds and, presumably, AFI would incur an indebtedness to the Jenkinses for the Certificates of Deposit that would be lost.

When the Notes were signed, and at the time of the alleged advances, Jenkins knew AFI could not pay the Notes or the advances. AFI had no valuable assets, no business operations, no capital, and no income. Because AFI was incapable of repaying any advances, Jenkins would not receive any economic benefit from AFI. The only prospect Jenkins had to recover the advances was the release of the Certificates of Deposit. Whether and when the Certificates of Deposit would be released was uncertain. The Notes state that they would "be paid in full upon reclamation bond release." What is not clear from the evidence is whether AFI's obligation under the Notes would be satisfied upon the release of the bonds or whether AFI would have an indebtedness for efforts that only benefitted Jenkins.

The bankruptcy court considered each of the *Hedged–Investments* factors in light of the evidence before it, concluding that the weight of the evidence supported recharacterization of the Jenkinses' loans to equity. The bankruptcy court concluded that two of the *Hedged–Investments* factors were inapplicable, three of the factors "superficially" supported treatment of the advances as loans and the remaining seven factors "strongly" supported recharacterization. The bankruptcy court's conclusions are clearly supported by the evidence.

The first *Hedged–Investments* factor is "the names given to the certificates evidencing the indebtedness." The Jenkinses maintain that the bankruptcy court gave this factor insufficient weight. The bankruptcy court simply noted that, although the documents state they are promissory notes, they were all preprinted forms and the provisions regarding acceleration upon failure to make timely payments and attorney's fees stated "N/A." The Jenkinses are fortunate the bankruptcy court gave this factor any weight in their favor. The instruments may be titled promissory notes, but they do not "fulfill the proper formalities for a commercial loan."[30] The bankruptcy court correctly noted that the Jenkinses' advances were not "traditional-style" loans. A "loan" is a sum of money loaned for a specified period and repayable with an agreed interest. Typically, the amount loaned, the terms of repayment, and the interest are agreed to at the time the money is loaned. Advances, interest rates, and repayment terms are not customarily left to the discretion of the lender. The lender's right to receive repayment is supported by consideration, money loaned and accounted for with contempora-

**29.** *Miller v. Dow (In re Lexington Oil & Gas Ltd.),* 423 B.R. 353, 365 (Bankr.E.D.Okla. 2010).

**30.** *In re Hedged–Invs.,* 380 F.3d at 1299.

neous records. In short, the amount loaned and the amount to be repaid are readily calculable at the beginning of the transaction, are typically documented, and the obligation to pay is not conditional. Specifically, the lender is not entitled to receive repayment in excess of the amount actually loaned plus the agreed interest. On the other hand, "equity" is an investment—an expenditure of money—in order to earn a financial return. The amount of financial return is unknown and the entitlement to receive payment is conditional. The amount of payment received may be unrelated to the amount advanced or may be received in exchange for little consideration.

In the present case, there is little if any evidence that the terms of the promissory notes were determined prior to the advances, and the amounts advanced cannot be reconciled to the amount of the Notes. There is no accounting that connects the funds allegedly advanced to the amount of the Notes, and there are no contemporaneous records of funds advanced prior to or pursuant to the alleged loan. The Notes are not supported by reasonably equivalent consideration. AFI received no consideration in exchange for the first $500,000 note and, while there is evidence of advances, there is insufficient evidence to reconcile any alleged advances to AFI to the amounts stated in the additional promissory notes.[31] At the time the advances were made, the return the Jenkinses would receive on monies they advanced was uncertain and could only come from proceeds of the Certificates of Deposit. The bankruptcy court's inclusion of this factor on the side of loan characterization,

even superficially, was generous to the Jenkinses.

The second factor is "the presence or absence of a fixed maturity date." A fixed maturity is indicative of a loan rather than an equity investment. The Jenkinses contend that this factor supports loan treatment because each of the Notes contains a repayment date of 5 years from the date of issue. However, the language in the instrument is not determinative of this factor. The bankruptcy court correctly concluded that, notwithstanding this provision in the Notes, there was no fixed maturity date because Jenkins knew AFI had no ability to pay the Notes and he only advanced funds to obtain release of the Certificates of Deposit. Whether and when the Certificates of Deposit would be released was uncertain.

The third factor is the "source of payments." The bankruptcy court concluded that the parties looked to the Certificates of Deposit, not AFI, as the source of payment of the Notes, and for that reason found that the third factor weighed heavily in favor of recharacterization. The Jenkinses assert that advances made to a "flagging business" should not factor into the recharacterization analysis. The Jenkinses' argument completely ignores the bankruptcy court's actual finding, mistakenly focuses on the nature of the advances to the debtor rather than the source of payment from the debtor, and also misquotes the *Hedged–Investments* court. The *Hedged–Investments* court stated, "excessive suspicion about loans made by owners and insiders of struggling enterprises would discourage legitimate efforts to keep a flagging business afloat."[32] Although undercapitalization

---

**31.** The court found that "the amounts of the Notes were not directly related to transfers to AFI, but did roughly reflect the sum of checks that had been written by Green Acres to AFI during the prior year." *Redmond v. Jenkins*

*(In re Alternate Fuels, Inc.)*, Bankr.No. 09–20173, Adv. No. 11–6026, 2012 WL 6110429, at *11 (Bankr.D.Kan. Dec. 10, 2012).

**32.** *In re Hedged–Invs.*, 380 F.3d at 1298 n. 1.

remains an important factor, under the multi-factor approach, *Hedged–Investments* simply advised that bankruptcy courts should not give disproportionate weight to that factor.[33] Additionally, the Jenkinses' argument is not persuasive because they were not making advances to a "flagging business." AFI was out of business, and the Jenkinses were not attempting to resuscitate it. Jenkins clearly knew that repayment of the Notes was not dependent on AFI's business success, but was dependent on successful reclamation of the permitted mining sites. The bankruptcy court correctly concluded that the expected source of repayment was not AFI and this factor weighed heavily in favor of recharacterization.

"The right to enforce payment of principal and interest" is the fourth *Hedged–Investments* factor. The bankruptcy court found that the Jenkinses' right to enforce payment of the Notes was "illusory." When the Notes were executed, Jenkins and Pommier knew that AFI had no ability to pay the Notes, so any attempt to enforce payment would be futile. Thus, no attempts were made to enforce payment of the Notes. The Jenkinses again argue that the terms of the Notes should be dispositive and, since they had a contractual right to enforce payment, AFI's lack of ability to pay should be irrelevant. As previously stated, recharacterization looks beyond labels to the substance of a transaction.[34] Jenkins knew he could not enforce payment of the Notes. The bankruptcy court's finding that the Jenkinses' right to enforce payment was "illusory,"

and that this factor was supportive of recharacterization, is adequately supported by facts in the record.

The fifth factor is "participation in management flowing as a result" of the contribution. The bankruptcy court concluded that the fifth factor superficially supported treatment of the advances as loans. Since AFI was already under Jenkins' control when the advances were made, there was no resulting increase in management as a result of the advances. Again, the court's determination that this factor superficially supported characterization as loans was more favorable to the Jenkinses than it needed to be. The court easily could have determined this factor was inapplicable because Jenkins already exercised complete control of AFI.

The sixth factor is the "status of the contribution in relation to regular corporate creditors." The bankruptcy court concluded that this factor was not relevant.[35] The Jenkinses dispute this conclusion because there is no subordination language in the Notes. Here again, the bankruptcy court's conclusion that this factor was not relevant was more favorable to the Jenkinses than it needed to be. While express subordination language may be relevant, the court need not limit its inquiry into this factor to express subordination, as there are other inquiries that may be relevant to the "status" of the contribution in relation to other creditors.[36] If the advances from the Jenkinses were, as alleged, used to pay creditors of AFI for costs associated with its reclamation efforts, then the Jenkinses were effectively

---

**33.** *Id.*

**34.** *Id.* at 1297.

**35.** The court concluded that "[s]ince AFI had no income other than the Jenkinses' advances to pay creditors, the fact that creditors were paid and the Jenkinses were not has no rele-

vancy." *In re Alternate Fuels*, 2012 WL 6110429, at *11.

**36.** For example, constructive subordination—payment of other creditors in lieu of payments pursuant to the terms of the instrument in dispute—may be a relevant factor.

subordinating their right to payment to AFI's other creditors. Because the bankruptcy court could have concluded that the Jenkinses were effectively subordinating their right to payment, its conclusion that this factor was not relevant is not clearly erroneous.

With respect to "the intent of the parties," the seventh factor, the record is quite clear. In fact, the parties' intent was largely stipulated to in the bankruptcy court's pre-trial order.[37] The purpose of the advances and the Notes was to secure the Jenkinses' investment by funding the reclamation process with the intent and purpose of having the Certificates of Deposit released to the Jenkinses. The Jenkinses maintain that the bankruptcy court misconstrued this factor when it focused on the purpose of the Notes, which was to secure the Jenkinses' investment in AFI and Cimarron, and failed to focus on "whether the parties intended that the money be repaid pursuant to the instrument." If this were a distinction with a difference, it still would not help the Jenkinses. Jenkins candidly and succinctly testified that everyone knew AFI had no money to pay the Notes and the only way he was going to be repaid was by release of the Certificates of Deposit. It is clear, when the first three Notes were signed, the parties did not intend that the advances be repaid by AFI pursuant to the terms of the Notes. Jenkins expected payment to come from the Certificates of Deposit rather than from AFI.

The eighth factor is "'thin' or adequate capitalization." The Jenkinses' only dispute on this factor is that the bankruptcy court placed too much emphasis on AFI's thin capitalization. Undercapitalization is an important factor, but the Jenkinses argue that courts should not give "disproportionate weight to the poor capital condition" of the debtor company.[38] Disproportionate weight should not be given to undercapitalization when there is a legitimate prospect that a flagging business will be able to generate income and repay the contribution. But, if there is absolutely no prospect of repayment from business operations or liquidation of assets, this factor should be given appropriate weight. When the Jenkinses made the alleged advances, AFI had no capital, no business activity, no assets to liquidate, and no prospect of generating any income. The Jenkinses were not attempting to rescue, rehabilitate, or revive AFI; they were only attempting to obtain the Certificates of Deposit. The bankruptcy court did not place disproportionate weight on this factor and properly concluded that AFI's total lack of capital strongly supported recharacterization.

The Jenkinses do not dispute the ninth *Hedged–Investments* factor, the "identity of interest between the creditor and stockholder." Because the Jenkinses made all of the advances and were also the only shareholders, there was a 100% identity of interest. The bankruptcy court determined that this factor favored equity characterization.

The bankruptcy court found that the tenth factor, the "source of interest payments," was not applicable because AFI never made any interest payments. The Jenkinses argue that the bankruptcy court missed the mark because the Notes provide that interest would be paid and the Cabanas litigation provided a source for interest payments. It is the Jenkinses who miss the mark here. The interest provision in the Notes does not address

---

**37.** *See* Final Pretrial Order at ¶¶ 34–38, *in* Appx. at 86–87.

**38.** *In re Hedged–Invs.*, 380 F.3d at 1298 n. 1.

the source of payments actually made. At the time the Notes were signed, the Cabanas litigation did not exist and AFI had no identifiable income source for interest payments. The bankruptcy court was correct that this factor is not relevant in this case.

The eleventh *Hedged–Investments* factor focuses on "the ability of the corporation to obtain loans from outside lending institutions." If the debtor is unable to obtain outside financing, "the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." [39] The bankruptcy court found that AFI had unsuccessfully attempted to obtain financing from at least six banks and, therefore, this factor strongly supported recharacterization. The Jenkinses did not contest this determination.

The bankruptcy court concluded that the twelfth factor, "the extent to which the advance was used to acquire capital assets," superficially supported characterization as loans, as the use of funds for operating expenses is generally indicative of a loan. But the court noted that, during the relevant time period, AFI made no capital acquisitions so there was no decision made as to whether to use the advances to fund operations or purchase assets. Given these facts, the bankruptcy court correctly concluded this factor was of reduced significance.

Finally, the thirteenth factor considers "the failure of the debtor to repay on the due date or to seek a postponement." The bankruptcy court found that none of the Notes were paid by their 5–year due dates and no extensions were sought. The court also noted that none of the parties appeared to view AFI's failure to pay or seek

extensions to be a default. The court concluded this factor strongly supported recharacterization as well. Again, the Jenkinses do not contest this finding.

In summary, the bankruptcy court's conclusion that the Jenkinses' claim should be recharacterized as equity is supported by the facts and is not clearly erroneous. The bankruptcy court used the detailed list of factors set forth in *Hedged–Investments* to analyze the totality of the circumstances surrounding the transactions. The facts and circumstances surrounding the disputed transactions clearly support recharacterization. Jenkins paid Warmack $549,250.00 to purchase Warmack's equity interest in AFI and Cimarron and Warmack's interest in the Certificates of Deposit. This was clearly a payment for an equity interest, and AFI received none of these funds. The intended purpose of AFI's reclamation was to enable the Jenkinses to obtain the Certificates of Deposit. AFI had no capital or funds to finance the reclamation, could not obtain outside financing to fund the reclamation, and would receive no economic benefit from completing the reclamation. The Jenkinses were the beneficial owners of AFI and controlled AFI. They knew, since AFI had no ability to pay the Notes, they would be unable to enforce payment. The only purpose to the reclamation and the advances was to benefit the beneficial owners of AFI. The advances should be treated as equity contributions.

## B. The Bankruptcy Court Correctly Disallowed the Jenkinses' Proof of Claim.

 The bankruptcy court disallowed the Jenkinses' claim because they

---

**39.** *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 752 (6th Cir.2001).

failed to carry their burden of persuasion as to the validity and amount of their claim. If an objection is made to a proof of claim, the creditor has the ultimate burden of persuasion as to the validity and amount of the claim.[40] The record amply supports the bankruptcy court's finding.

As the bankruptcy court noted, there is no direct correlation between the worksheets Jenkins claims memorialized AFI's reclamation costs and the amount of the Notes. Only one of the worksheets Jenkins relied upon was acknowledged by Pommier[41] and, in any event, the worksheets are not contemporaneous records of transactions but are simply summaries and calculations based on checks Jenkins has produced. They are also facially inconsistent with the Notes.

There is no evidence that a $500,000 transfer was made to AFI in December 1999. The evidence is that the funds the Jenkinses advanced in late 1999 were paid to Warmack, and were used to pay secured debt on equipment owned by Cimarron. In exchange for this payment, the Jenkinses received Warmack's interest in AFI, Cimarron, and the Certificates of Deposit. Although AFI did not receive any of these funds, it executed the first $500,000 Note in favor of Green Acres Farms. Since AFI received nothing in exchange for the first Note, it was not supported by any consideration.

The evidence shows that a $170,000.00 advance to AFI on June 30, 2000, was used to pay off Cimarron's obligation to Girard National Bank for equipment.[42] Contrary to the Jenkinses' assertion that the $170,000 was an advance to AFI, it was used to pay a Cimarron obligation, and AFI received no benefit from these funds. Also included in the Jenkinses' proof of claim is a November 6, 2001, direct payment from Green Acres Farms to Girard National Bank for $137,900.[43] The memo on the check states that payment was to "Pay off Cimarron Note on Equipment @ G.N.B." There is no evidence that AFI received any benefit from this payment.

There are two other payments the Jenkinses include in their proof of claim: (1) a payment from Green Acres Farms directly to Girard National Bank, on December 28, 2004, in the amount of $33,518.59 for equipment;[44] and (2) another payment from Green Acres Farms, on February 28, 2005, in the amount of $50,116.64 for a loan payment.[45] There is no evidence that either of these payments benefitted AFI.

Consequently, the evidence is that AFI did not benefit from or receive any consideration for at least $891,535.23 of the approximately $2,423,812.81 principal amount that the Jenkinses claim. There are numerous other checks evidencing payments directly to parties other than AFI and, although many of those checks were written to AFI, they were immediately endorsed to Cimarron and were never deposited into an AFI account.

In addition to payment of the three Notes, the Jenkinses' proof of claim seeks payment of $487,298.62 for money related to reclamation and to accounts for Dan Card and Pat Miller. There is no promis-

40. *In re Hedged–Invs.*, 380 F.3d at 1297–98.

41. *See* Depo. Ex. 4, *in* Appx. at 850.

42. *See* Green Acres Farms Check No. 1070, *in* Appx. at 966.

43. *See* Green Acres Farms Check No. 1339, *in* Appx. at 990.

44. *See* Green Acres Farms Check No. 1938, *in* Appx. at 923.

45. *See* Green Acres Farms Check No. 1990, *in* Appx. at 926.

sory note from AFI with respect to this portion of the claim, and the Jenkinses presented no evidence to substantiate this claim other than exhibit G attached to their proof of claim.[46] A review of exhibit G reveals that it is not evidence at all but simply a hand-written list entitled "Total Money Due 10–31–08," without any other foundation. Simply writing amounts claimed to be due on paper does not meet the claimant's burden to prove a claim.

Any claim the Jenkinses may have is nowhere near the amount they assert. The only options for the bankruptcy court were to speculate as to the amount and validity of the Jenkinses' claim or disallow it. It would have been error for the court to speculate, and the evidence in this case clearly supports its finding that the Jenkinses failed to carry their burden to prove the amount and validity of their claim.

## C. The Jenkinses' Secured Claim Should be Subordinated.

Section 510 of the Bankruptcy Code[47] permits bankruptcy courts to subordinate all or part of an allowed claim to all or part of another allowed claim. Equitable subordination is not based on the substance of a transaction, but rather on the behavior of the parties involved, and is intended to remedy some inequity or unfairness. Three requirements "must be met for a court to exercise its equitable subordination power: (1) *inequitable conduct* on the part of the claimant sought to be subordinated; (2) injury to the other creditors of the bankrupt or *unfair advantage for the claimant resulting from the claimant's conduct;* and (3) consistency

with the provisions of the Bankruptcy Code."[48] The first of these requirements, inequitable conduct, "encompasses three categories of misconduct: (1) fraud, illegality, and breach of fiduciary duties; (2) *undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego.*"[49] When a claimant is an "insider," a different level of scrutiny applies, and "the party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider."[50] Even applying the higher level of scrutiny, the evidence clearly supports the bankruptcy court's findings and the subordination of the Jenkinses' "secured" claim.

It is uncontroverted that AFI was undercapitalized. Jenkins' stated purpose when operating AFI was to obtain a release of the Certificates of Deposit for his own benefit. Because he was prohibited from holding stock in AFI, Jenkins accomplished this goal by having the legal interest in AFI placed in Christie's name. Jenkins' manipulation of AFI enabled him to obtain the Notes that are unsupported by adequate consideration and vastly exceed the claimed advances to AFI. Finally, Jenkins used his knowledge and control of AFI to obtain an assignment of the Cabanas litigation proceeds to secure his bogus antecedent debt.

Jenkins argues that subordination is not appropriate because there would have been no judgment proceeds if he had not advanced the sums the Jenkinses seek to recover and, therefore, no creditors were harmed. While it may be true that the

---

46. *See* Ex. G to Proof of Claim dated 7/11/2009, *in* Appx. at 1566.

47. 11 U.S.C. § 510(c)(1).

48. *Sender v. Bronze Group, Ltd. (In re Hedged–Invs. Assocs., Inc.),* 380 F.3d 1292, 1300 (em-

phasis added) (internal quotation marks omitted).

49. *Id.* at 1301 (emphasis added) (internal quotation marks omitted).

50. *Id.*

Cabanas litigation proceeds resulted from Jenkins' efforts, this one fact does not justify his attempts to take advantage of his situation to secure payment of his alleged reclamation costs ahead of other AFI creditors. There was no source of repayment at the time of the Jenkinses' advances. The Cabanas litigation was the only source of repayment, and Jenkins unfairly took advantage of his inside knowledge and control of AFI to obtain the assignment of those litigation proceeds, to the detriment of AFI's other creditors.

In summary, the Jenkinses assert a secured claim that: (1) arose from their use of AFI as an instrumentality for their benefit while it was undercapitalized; (2) gave them an unfair advantage by use of their inside knowledge of the Cabanas litigation and their control of AFI, which allowed them to obtain an assignment of litigation proceeds and to secure their questionable antecedent debt to the disadvantage of other creditors; and (3) subordination is consistent with the provisions of the Bankruptcy Code. Further, the Jenkinses are insiders who assert a claim that is inadequately documented, lacks adequate consideration and, at a minimum, is grossly overstated. These deficiencies all resulted from their own culpable conduct, and the bankruptcy court's equitable subordination of their "secured" claim is not clear error.

## V. CONCLUSION

Looking at the transactions the Jenkinses rely upon in their entirety, and applying the *Hedged–Investments* factors, recharacterization was appropriate. The Jenkinses failed to carry their burden to prove the validity and the amount of their claim and it should have been disallowed. Finally, even assuming the Jenkinses' claim was allowed, their "secured" claim should be subordinated and any allowed claim should be treated as unsecured. The bankruptcy

court's legal conclusions were correct and its factual findings were supported by the record and were not clearly erroneous. The bankruptcy court's ruling is therefore AFFIRMED.