FILED
United States Court of Appeals
Tenth Circuit

June 12, 2015

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

In re: ALTERNATE FUELS, INC.,

    Debtor.

------------------------------

CHRISTOPHER JOHN REDMOND,
Chapter 11 Trustee,

    Plaintiff - Appellee,

v.

WILLIAM KARL JENKINS, a/k/a W.
K. Jenkins, d/b/a Green Acres Farm;
M. EARLENE JENKINS, d/b/a Green
Acres Farm,

    Defendants Third-Party
    Plaintiffs - Appellants,

and

CIMARRON ENERGY COMPANY,
LLC,

    Defendant,

v.

LARRY POMMIER; MICHAEL
CHRISTIE,

    Third-Party Defendants.

No. 14-3086

**APPEAL FROM THE UNITED STATES BANKRUPTCY
APPELLATE PANEL
(BAP No. 12-110-KS)**

Jonathan Sternberg, Jonathan Sternberg, Attorney, P.C., Kansas City, Missouri, for Defendants Third-Party Plaintiffs - Appellants.

P. Glen Smith (Christopher J. Redmond, with him on the brief), Husch, Blackwell, L.L.P., Kansas City, Missouri, for Plaintiff - Appellee.

Before **KELLY**, **BALDOCK**, and **PHILLIPS**, Circuit Judges.

**KELLY**, Circuit Judge.

Appellants William Karl Jenkins and M. Earlene Jenkins (collectively, Mr. Jenkins) appeal from an order of the Bankruptcy Appellate Panel (BAP) affirming the bankruptcy court's dismissal of their claim for the payment of certain secured promissory notes. In re Alternate Fuels, Inc., 507 B.R. 324 (B.A.P. 10th Cir. 2014). The bankruptcy court found that Mr. Jenkins' claim was not an allowed claim because the transfers alleged to be consideration for the notes should be recharacterized as equity contributions. In re Alternate Fuels, Inc., Bankr. No. 09–20173, 2012 WL 6110429, at *12 (Bankr. D. Kan. Dec. 10, 2012). In the alternative, the court found that Mr. Jenkins failed to sustain his burden of proof as to the validity and amount of his claim. Id. at *17. Finally, and again in the alternative, the court found that Mr. Jenkins' putatively secured claim should be

subordinated to the status of an unsecured claim. Id. at *14–15. Our jurisdiction arises under 28 U.S.C. § 158(d), and we reverse. Mr. Jenkins' transfers do not meet our criteria for either recharacterization or equitable subordination, and he has satisfied his burden of proof as to the validity and amount of his claim.

Background

Alternate Fuels, Inc. (AFI) is a Kansas corporation that formerly engaged in surface coal mining operations. On December 9, 1992, AFI filed a petition under Chapter 11 of the Bankruptcy Code in the District of Kansas. AFI briefly continued its coal mining operations under the terms of a confirmed plan of reorganization. During this time, Larry Pommier was hired as AFI's field engineer and financial cost analyst. In 1996, AFI ceased all mining operations and abandoned its assets to various creditors. The Chapter 11 trustee who was operating the reorganized debtor resigned.

At that time, John Warmack acquired 100% of the stock of AFI and assumed control. Mr. Warmack became the sole director of AFI and appointed Mr. Pommier as president. Mr. Warmack then formed Cimarron Energy Co., LLC (Cimarron) to handle the mining operations for which AFI still held permits. Mr. Warmack owned 99% of Cimarron, and Mr. Pommier owned 1%. Mr. Warmack provided the State of Missouri with certain new reclamation bonds and replacement reclamation bonds, which assured that AFI would restore permitted

mining sites to their original condition. Twenty-four certificates of deposit, valued at approximately $1.4 million, were pledged to secure the bonds. Then, Cimarron recommenced mining operations. AFI's equipment was released to AFI's secured creditors, who ultimately foreclosed and sold the equipment back to Cimarron. At this time, AFI remained liable for debts which were not addressed in the 1992 bankruptcy.

By 1999, Mr. Warmack had completed his mining efforts, but AFI was still obligated to reclaim the land at the permitted sites. On December 6, 1999, Mr. Jenkins entered into an agreement to purchase Mr. Warmack's interest in AFI. Mr. Jenkins did not intend to resume mining operations or otherwise operate AFI. Instead, Mr. Jenkins believed that, through his political connections, he could fulfill AFI's remaining reclamation obligations and obtain the proceeds of the release of the 24 certificates of deposit and the sale of Cimarron's mining equipment. I Aplt. App. 97.

Mr. Jenkins paid Mr. Warmack $549,250 and received in exchange: (a) 100% of the stock of AFI and 99% of the ownership of Cimarron, (b) certain equipment owned by Cimarron, and (c) the assignment of the 24 certificates of deposit. Because Mr. Jenkins was listed in the Applicant Violator System of the federal Office of Surface Mining, Reclamation, and Enforcement, he arranged for the AFI stock to be placed in the name of a straw man or agent, Michael Christie. Mr. Christie held the beneficial interest in AFI but had no significant involvement

with either AFI or Cimarron. Mr. Warmack used the $549,250 to pay down debts of AFI secured by the Cimarron equipment Mr. Jenkins received. Note that the certificates of deposit were assigned to Mr. Jenkins personally—not to AFI or Cimarron. Mr. Jenkins has been receiving interest earned on the certificates since his purchase of Mr. Warmack's interest in AFI.

Also on December 6, 1999, AFI executed, upon the signature of Mr. Pommier, the first of the three promissory notes attached to Mr. Jenkins' proof of claim. I Aplt. App. 61. The note was in the amount of $500,000, payable to Green Acres Farms, a fictitious business name Mr. Jenkins registered with the State of Missouri. It bears the signature of Mr. Jenkins as witness.

The note states:

Principal balance plus accrued interest shall be due and payable five (5) years from the date shown above. This note shall be paid in full upon reclamation bond release from the State of Missouri. Said bonds currently being used to secure reclamation liability for Alternate Fuels, Inc. at the Blue Mound Mine.

Id. The note identified the underlying consideration as "value received," and the interest rate was 9.5%.

Mr. Jenkins was aware that AFI had no present ability to repay the note from its own funds. However, as Mr. Pommier testified, if Mr. Jenkins received the proceeds of the release of the certificates of deposit upon the completion of reclamation, AFI would owe no money on the note. IV Aplt. App. at 697. Mr.

Jenkins testified that the released certificates of deposit were his only anticipated source of future payment.

Cimarron held all of AFI's assets—comprised primarily of operating and reclamation equipment—and conducted all of its activities. AFI had no income other than advances provided by Mr. Jenkins through checks drawn on accounts of Green Acres Farms. These checks were delivered to Mr. Pommier, who endorsed them immediately for payment to Cimarron. The advanced funds were never deposited into AFI accounts and were therefore never subject to the claims of AFI's unpaid creditors. There was no contemporaneous accounting of the advances; instead, annual worksheets enumerated his checks to AFI. VI Aplt. App. 1152–1230.

On November 6, 2000, AFI executed a second promissory note in the amount of $500,000 "plus any future advances" to "Green Acres Farms or Assigns." I Aplt. App. 64. The interest rate was 9%, and the note's terms were otherwise identical to the previous note. Mr. Jenkins did not provide an accounting to connect funds advanced by Green Acres Farms prior to the date of the second note to the amount of that note. Mr. Jenkins again testified that he knew AFI had no prospect of repaying this note from its own funds; his only prospects for future payment were the certificates of deposit.

On October 11, 2001, Mr. Pommier executed a third promissory note in the amount of $1,000,000 on behalf of AFI. I App. Aplt. 67. Mr. Pommier testified

that this note was a replacement for the two prior notes, which Mr. Jenkins denied. The interest rate was 8%, and, again, the note's terms were otherwise identical to the previous notes. Mr. Jenkins did not provide a contemporaneous accounting to support the amount of the third note.

In 2002, AFI filed a lawsuit (the Cabanas suit) against certain state officers and employees, alleging tortious interference with the completion of AFI's reclamation process. Alternate Fuels, Inc. v. Cabanas, No. 4:02-cv-01182-JTM (W.D. Mo. filed Dec. 23, 2002). Due to the cessation of reclamation efforts pending the Cabanas suit, Mr. Jenkins "saw that [his] chances of recovering on AFI's certificates of deposit were diminishing." Aplt. Br. 17 (citing III Aplt. App. 480). Thus, in exchange for Mr. Jenkins continuing to fund AFI and as security for his loans, on March 1, 2003 AFI assigned $3 million of its potential recovery to Mr. Jenkins.[1] Id.; I Aplt. App. 59.

On September 6, 2006, a judgment in the Cabanas suit was entered in favor of AFI for actual damages of approximately $5.5 million and punitive damages of $900,000. Following an appeal, and after payment of contingent attorneys fees

---

[1] On the same date, a fourth note in the principal amount of $2.4 million was executed. VI Aplt. App. 1151. It states that it is a renewal of the first three notes, including accrued interest. The payment terms read: "Principal balance plus accrued interest shall be due and payable on or before five (5) years from the date shown above . . . . This note shall be paid in full upon reclamation bond release from the State of Missouri *or proceeds from lawsuit filed in Federal Court case no. 02CV1182. . . .*" Id. This fourth note is not included in Mr. Jenkins' proof of claim.

and costs, the recovery amounted to almost $5 million. News of the judgment spread, and AFI's creditors began making claims against the judgment proceeds. On January 28, 2009, AFI filed for a second bankruptcy for assistance in determining the priority of payment.

Mr. Jenkins filed a proof of claim against AFI's estate in the amount of $4.3 million. Id. at 57. The claim included $3.8 million for payment of the three promissory notes, plus interest, secured by AFI's assignment of $3 million of the Cabanas suit proceeds.[2] Although attachments to the proof of claim include a list of the assigned certificates of deposit in the total principal amount of $1.4 million, these certificates are not included in the claim because they were assigned to Mr. Jenkins personally—not to AFI. In addition to Mr. Jenkins' putative secured claim, there are several unsecured claims, totaling $5.7 million, by various construction companies, insurance companies, and the State of Missouri. Three of the largest unsecured claims arose before or during AFI's first bankruptcy.

Exercising authority under 11 U.S.C. § 105(a) and applying the Tenth Circuit's established test for recharacterization, the bankruptcy court found that the transfers evidenced by the promissory notes underlying Mr. Jenkins' claim

---

[2] Mr. Jenkins' claim also included $487,298.62 for "money" related to reclamation and $25,651.56 for "accounts" of Dan Card and Pat Miller. I Aplt. App. 71.

should be recharacterized as equity.[3]  In re Alternate Fuels, Inc., 2012 WL 6110429, at *12.  Since his recharacterized debt claim was no longer allowed to proceed in AFI's bankruptcy, Mr. Jenkins did not hold a claim secured by the alleged assignment of the Cabanas suit proceeds.  Id. at *13.

The court also held, in the alternative, that Mr. Jenkins failed to provide sufficient documentation to prove the amount of his claim.  Id. at *17.  Although the record showed that Mr. Jenkins had made numerous transfers to AFI, the court found that neither the attachments to the proof of claim nor the trial evidence allowed a determination of the precise amount owed to him.  The court noted that his claim was subject to denial on this basis alone.  Id.

Finally, the court held, again in the alternative, that equitable subordination under 11 U.S.C. § 510(c) would be appropriate.  Id. at *14–15.  Finding that Mr. Jenkins had acted inequitably to the detriment of AFI's creditors, the court subordinated his claim "to the level of an unsecured claim on par with the other unsecured claims, accompanied by the transfer of the Jenkinses' interest in the Cabanas judgment to the estate."  Id. at *15.

On appeal, the Tenth Circuit Bankruptcy Appellate Panel (BAP) affirmed. In re Alternate Fuels, Inc., 507 B.R. at 327.

---

[3]  The court also found that the remainder of Mr. Jenkins' claim, for "money" related to reclamation and for "accounts" of Dan Card and Pat Miller, should be recharacterized.  In re Alternate Fuels, Inc., 2012 WL 6110429, at *12. Mr. Jenkins does not appear to appeal the court's denial of this portion of his claim.

<u>Analysis</u>

I.     <u>Recharacterization Is Not Warranted Under These Facts</u>

Although Mr. Jenkins appeals from the BAP's ruling, the Tenth Circuit reviews the decision of the bankruptcy court, applying the "same standards of review that govern appellate review in other cases." <u>In re C.W. Mining Co.</u>, 749 F.3d 895, 898 (10th Cir. 2014). "Whether a transaction labeled as a loan should be recharacterized as an equity investment is a mixed question of fact and law." <u>In re Hedged-Investments Assocs., Inc.</u>, 380 F.3d 1292, 1297 (10th Cir. 2004). We review the bankruptcy court's factual findings for clear error, but the application of our legal test for recharacterization to those facts is a question of law which we review de novo. <u>Id.</u> at 1297–98. We note that, in making its factual findings, the court relied "heavily" upon the exhibits because the two primary fact witnesses—Mr. Jenkins and Mr. Pommier—were not "very credible." <u>In re Alternate Fuels, Inc.</u>, 2012 WL 6110429, at *2.

A.     <u>The Tenth Circuit's *Hedged-Investments* Test Remains Good Law</u>

First, we reject Mr. Jenkins' argument that two recent Supreme Court decisions implicitly overruled this court's precedent regarding the proper test for determining when recharacterization is appropriate.

Although the Bankruptcy Code does not expressly address recharacterization, we held in <u>Hedged-Investments</u> that the authority to recharacterize putative debt as equity arises from a court's general equitable

- 10 -

powers under 11 U.S.C. § 105(a).  See In re Hedged-Investments, 380 F.3d at

1298 (adopting the Sixth Circuit's recharacterization analysis in In re AutoStyle

Plastics, Inc., 269 F.3d 726, 748, 750 (6th Cir. 2001), including its reliance on

§ 105(a)).  Section § 105(a) states:

> The court may issue any order, process, or judgment that is necessary or
> appropriate to carry out the provisions of this title.  No provision of this
> title providing for the raising of an issue by a party in interest shall be
> construed to preclude the court from, sua sponte, taking any action or
> making any determination necessary or appropriate to enforce or implement
> court orders or rules, or to prevent an abuse of process.

Recharacterization under § 105(a) is essential to a court's ability to properly

implement the priority scheme of the Bankruptcy Code.  See In re Paige, 685 F.3d

1160, 1183 (10th Cir. 2012) (explaining that the Code "requires that certain

classes of claimants be paid in full before any member of a subordinate class is

paid").

When a court recharacterizes putative debt as equity, it "effectively

ignore[s] the label attached to the transaction at issue and instead recognize[s] its

true substance."  In re Hedged-Investments, 380 F.3d at 1297.  "The funds

advanced are no longer considered a loan which must be repaid in bankruptcy

proceedings as corporate debt, but are instead treated as a capital contribution."

Id.  The practical effect of recharacterizing a putative debt claim as an equity

interest is subordination, since a corporation repays capital contributions only if

and when it has satisfied all other obligations.  In re AutoStyle Plastics, 269 F.3d

- 11 -

at 749.  In this way, recharacterization ensures that "controlling equity owners of a troubled corporation [do not] jump the line of the bankruptcy process and thwart the company's outside creditors' and investors' priority rights."  In re Hedged-Investments, 380 F.3d at 1298 (citing In re Mid-Town Produce Terminal, Inc., 599 F.2d 389, 391–92 (10th Cir. 1979)).

Mr. Jenkins argues that, under two recent Supreme Court cases, Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co., 549 U.S. 443 (2007), and Law v. Siegel, 134 S. Ct. 1188 (2014), a bankruptcy court's authority to recharacterize debt as equity arises not from § 105(a) but from 11 U.S.C. § 502(b).  Section 502(b)(1) states:

> [A] court . . . shall allow [a] claim . . . except to the extent that . . . such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured.

"Applicable law" within the meaning of § 502(b) is state law.  See Butner v. United States, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").  Mr. Jenkins contends that, since § 105(a) is not a proper source of authority to recharacterize a transaction, the 13-factor test outlined in Hedged-Investments is no longer valid.

In Travelers, the Supreme Court considered whether federal bankruptcy law precluded an unsecured creditor from recovering attorney's fees authorized by a

prepetition contract and incurred in postpetition litigation. 549 U.S. at 445. In the proceedings below, the Ninth Circuit had held that such fees were categorically prohibited by the rule adopted in In re Fobian, 951 F.2d 1149 (9th Cir. 1991). Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co., 167 F. App'x 593, 594 (9th Cir. 2006) ("[A]ttorney fees are not recoverable in bankruptcy for litigating issues peculiar to federal bankruptcy law."). Reversing the Ninth Circuit, the Supreme Court rejected the Fobian rule because it lacked textual support. The Court explained that, when applying § 502(b), "we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." Travelers, 549 U.S. at 452. This presumption exists because "property interests are created and defined by state law." Id. at 451. Unless a specific federal interest requires a contrary result, "there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." Id. Mr. Jenkins argues that this analysis abrogates the Hedged-Investments test by holding that "a court may not fashion a test 'solely of its own creation' in determining what constitutes a 'claim' for purposes of bankruptcy." Aplt. Br. 35.

　　In Law, the Supreme Court considered whether a bankruptcy court may require a debtor's exempt assets to be used to pay administrative expenses incurred as a result of the debtor's misconduct. 134 S. Ct. at 1192. The Court found this "surcharge" to be unauthorized. The Court explained that, under

§ 105(a), a bankruptcy court has statutory authority to issue any order that is "necessary or appropriate" to carry out the provisions of the Bankruptcy Code. Id. at 1194. However, it is "hornbook law" that § 105(a) does not allow a bankruptcy court to "override explicit mandates of other sections of the Bankruptcy Code." Id. Because the bankruptcy court's order contravened an express provision, § 522, the court "exceeded the limits of its authority under § 105(a) and its inherent powers." Id. at 1195. Citing this analysis, Mr. Jenkins argues that recharacterization under § 105(a) is not permissible when it would conflict with § 502(b). Aplt. Br. 39–40.

The Fifth and Ninth Circuits have rejected reliance on § 105(a) as a source of authority to recharacterize putative debt, and Mr. Jenkins urges us to follow suit. These circuits have held that, "to determine whether a particular obligation owed by the debtor is a 'claim' for purposes of bankruptcy law," a court must simply "determine whether that obligation gives the holder of the obligation a 'right to payment' under state law." In re Fitness Holdings Int'l, Inc., 714 F.3d 1141, 1148–49 (9th Cir. 2013); see also In re Lothian Oil, Inc., 650 F.3d 539, 542–44 (5th Cir. 2011).

We note that neither Travelers nor Law deal directly with recharacterization. These cases do not mention recharacterization or discuss it in any context, and they do not expressly overrule Hedged-Investments or any recharacterization case from any other circuit. Further, Mr. Jenkins' expansive

- 14 -

interpretation of <u>Travelers</u> and <u>Law</u> conflates disallowance of a claim under

§ 502(b) with recharacterization under § 105(a).  Although related, disallowance

and recharacterization require different inquiries and serve different functions.

Under § 502(b), disallowance of a claim is appropriate "when the claimant has no

rights vis-à-vis the bankrupt, i.e., when there is 'no basis in fact or law' for any

recovery from the debtor."  <u>In re Official Comm. of Unsecured Creditors for</u>

<u>Dornier Aviation (N. Am.), Inc.</u>, 453 F.3d 225, 232 (4th Cir. 2006).

Recharacterization, on the other hand, is not an inquiry into the enforceability of

a claim; instead, it is an inquiry into the true nature of a transaction underlying a

claim.  In this way, recharacterization is part of a long tradition of courts applying

the "substance over form" doctrine.  <u>Id.</u> at 233; <u>see also</u> <u>Pepper v. Litton</u>, 308

U.S. 295, 305–06 (1939) ("[Courts] have been invoked to the end that fraud will

not prevail, that substance will not give way to form, that technical considerations

will not prevent substantial justice from being done.").  Unlike disallowance of a

claim, recharacterization of a loan as equity does not ultimately relieve a debtor

from his obligation to repay the claimant.  Although the claimant may not proceed

in bankruptcy—since he no longer holds an allowed "claim"—he may still hold a

valid interest in equity to be paid upon satisfaction of the debtor's other

outstanding obligations.

Because disallowance and recharacterization are distinct inquiries, "[e]ven

if a claimant is able to meet § 502's minimal threshold for allowance of the

claim," a court must still "determine the claim's proper priority" by scrutinizing the true substance of a contested transaction. In re Dornier Aviation, 453 F.3d at 232. We therefore reject Mr. Jenkins' contention that a court's power to recharacterize arises solely from the disallowance provision of § 502(b), rather than from § 105(a). Travelers and Law do not instruct otherwise. Travelers held simply that claims enforceable under state law will be allowed in bankruptcy unless they are expressly disallowed. Travelers does not prohibit a court from proceeding to a second step in its analysis, to determine whether an otherwise allowed claim fails in bankruptcy because it involves transactions properly characterized as equity. And Law held simply that a court may not employ § 105(a) to override other explicit mandates in the Bankruptcy Code. Here, no explicit mandate of the Bankruptcy Code prohibits recharacterization under § 105(a).

B.     Recharacterization is Not Appropriate Under *Hedged-Investments*

Mr. Jenkins next argues that, even if the Hedged-Investments test applies, it does not support recharacterization under the circumstances here. We agree.

In Hedged-Investments, we held that bankruptcy courts exercising authority under § 105(a) to recharacterize debt as camouflaged equity must apply a 13-factor test. These factors, which reflect the characteristics of an arm's length negotiation, are:

(1)     the names given to the certificates evidencing the indebtedness;

(2)     the presence or absence of a fixed maturity date;
(3)     the source of payments;
(4)     the right to enforce payment of principal and interest;
(5)     participation in management flowing as a result;
(6)     the status of the contribution in relation to other corporate creditors;
(7)     the intent of the parties;
(8)     "thin" or adequate capitalization;
(9)     the identity of interest between the creditor and stockholder;
(10)    the source of interest payments;
(11)    the ability of the corporation to obtain loans from outside lenders;
(12)    the extent to which funds were used to acquire capital assets; and
(13)    the failure of the debtor to repay on the due date or to seek a postponement.

Id. at 1298 (citing Stinnett's Pontiac Serv., Inc. v. C.I.R., 730 F.2d 634, 638 (11th Cir. 1984)).  The Hedged-Investments factors are not exclusive, and no single factor is dispositive.  Id. at 1298–99.  Further, the test is a "highly fact-dependent inquiry."  In re Dornier Aviation, 453 F.3d at 234.  The significance of each factor may vary depending on the circumstances.  In re Hedged-Investments, 380 F.3d at 1298–99.

We begin by emphasizing that Mr. Jenkins was engaged in a venture with substantial risk: he purchased equity in a struggling business with the singular goal of completing reclamation and receiving the proceeds of the certificates of deposit.  When the business needed additional financial support to reach its goal, Mr. Jenkins provided advances.  We find nothing inherently improper about this arrangement.

The bankruptcy court found that three of the Hedged-Investments factors "superficially support" treating Mr. Jenkins' advances as loans: the names given

- 17 -

to the certificates evidencing the indebtedness, participation in management flowing as a result of the advances, and the extent to which the advances were used to acquire capital assets. In re Alternate Fuels, Inc., 2012 WL 6110429, at *10. We agree that these factors support treating the advances as loans, but their support is not merely superficial.

Concerning the first factor, the three notes are each expressly titled "PROMISSORY NOTE," and they are plainly instruments of indebtedness. I Aplt. App. 61, 64, 67. The bankruptcy court discounted this fact by explaining that each document utilized a preprinted form, and the provisions regarding acceleration upon failure to make timely payment and attorney's fees stated "N/A." In re Alternate Fuels, Inc., 2012 WL 6110429, at *10. Certainly, our goal is to ensure that a putative claimant may not exalt form over substance. In re Hedged-Investments, 380 F.3d at 1297; In re SubMicron Sys. Corp., 432 F.3d 448, 454 (3d Cir. 2006). Yet, we are aware of no rule that all portions of a standardized form must be complete in order for a document labeled as a promissory note—which reflects an unconditional promise to pay a certain party a fixed amount of money, with interest, at a definite time—to be deemed a promissory note.

Furthermore, we have no reason to doubt the explicit label given to the notes since the Trustee does not directly argue, and the bankruptcy court did not find, that they were invalid or unenforceable instruments under Kansas law. To

the extent the Trustee questions their validity by arguing that the underlying consideration was insufficient, Aplee. Br. 47, 51, his analysis is misguided. It is true that there is "no direct correlation" between the worksheets enumerating Mr. Jenkins' checks to AFI and the amount of the notes. In re Alternate Fuels, Inc., 2012 WL 6110429, at *5. For example, one accounting for the year 2000 shows transfers of $710,906.16, VI Aplt. App. 1152, and another shows transfers of $729,774.98, id. at 1189. The note dated November 6, 2000, for $500,000, matches neither amount. The bankruptcy court found, however, that the note amounts do "*roughly* reflect" the sums of Mr. Jenkins' checks to AFI during the prior year. In re Alternate Fuels, Inc., 2012 WL 6110429, at *11 (emphasis added).[4]

Regardless, the amount of a promissory note need not precisely correspond to the amount of underlying transfers serving as consideration. This is because, while a contract requires consideration to be valid, Kan. Stat. Ann. § 16-107, in general it need not have a value equivalent to the benefit received. "[C]onsideration legally sufficient for any purpose at all, even the slightest consideration, is sufficient for whatever purpose the parties seek to use it." In re Alternate Fuels, Inc., 2012 WL 6110429, at *17; 17A Am. Jur. 2d Contracts § 115 (2015); see also State ex rel. Ludwick v. Bryant, 697 P.2d 858, 861 (Kan. 1985)

---

[4] The court further found that the assignment of the Cabanas suit proceeds as security for funds loaned to AFI was supported by adequate consideration— Mr. Jenkins' promise to continue loaning money to AFI. Id. at *17.

("[C]onsideration is sufficient if there is a benefit to the debtor or an inconvenience or deprivation to the creditor.").

Relatedly, we reject the Trustee's assertion that, because AFI immediately endorsed Mr. Jenkins' checks over to Cimarron, AFI received no benefit from Mr. Jenkins. Aplee. Br. 47. Many of AFI's activities were conducted through Cimarron, id. at 8., and a company clearly benefits when it is able to fund its operations. Also, advances serving as consideration for a note need not precede the note's execution. See Kan. Stat. Ann. § 84-3-303(a) (2014) ("An instrument is issued or transferred for value if . . . [t]he instrument is issued or transferred for a promise of performance, to the extent the promise has been performed."); Restatement (First) of Contracts § 75 (2014) (defining consideration to include "a return promise . . . bargained for and given in exchange for the promise"). The first promissory note is not unenforceable for lack of consideration simply because Mr. Jenkins offered no proof of antecedent transfers to AFI. Thus, the instruments duly labeled as promissory notes have not been shown to be invalid under Kansas law, and we find that the first Hedged-Investments factor weighs against recharacterization.

The bankruptcy court also found that the fifth factor "superficially" suggested debt because there was no evidence that Mr. Jenkins increased his participation in the management of AFI as a result of his advances. We agree, and the court erred when it proceeded to discount this clear finding. Similarly,

- 20 -

concerning the twelfth factor, the bankruptcy court held that AFI's use of Mr. Jenkins' advances to fund operating expenses rather than to purchase capital assets—indicating debt—is irrelevant because AFI incurred no expenses other than the funding of reclamation operations. This appears to be a tautology. AFI necessarily made a choice between allocating Mr. Jenkins' funds toward operations or toward capital asset acquisition; it chose the former. This was an obvious decision given AFI's narrow objectives but a decision nonetheless.

Additionally, we find no support for many of the bankruptcy court's other findings in favor of recharacterization. For example, the court held that the ninth factor, the identity of interest between the creditor and stockholder, suggests equity. "[I]f advances are made by stockholders in proportion to their respective stock ownership, an equity contribution is indicated." In re Alternate Fuels, Inc., 2012 WL 6110429, at *12 (citing Roth Steel Tube Co. v. C.I.R., 800 F.2d 625, 630 (6th Cir. 1986)). We agree this factor may indicate a capital contribution when two or more shareholders own debt in the same proportion as their underlying equity interests. See Bauer v. C.I.R., 748 F.2d 1365, 1370 (9th Cir. 1984) (comparing ratios of stock ownership and putative debt in the tax context). Yet the same reasoning does not automatically apply when a single shareholder owns the entirety of a company's stock. Otherwise, this factor would militate against finding true debt in any situation involving a single stockholder. We see no reason to assume that all funds transferred to a business owned by a single

- 21 -

stockholder must be in the nature of equity.  To be sure, there may be circumstances where a single stockholder may infuse equity to finance fixed assets or expand the business.  But absent some conscious purpose, and given the nature of recharacterization, we question why a holder of all of a company's stock would make additional equity investments in exchange for no additional equity; after all, one cannot own more than all of a company's stock.

Concerning the second factor, the court held that the notes lack a fixed maturity date, indicating a capital contribution.  In re Alternate Fuels, Inc., 2012 WL 6110429, at *11; see also Stinnett's Pontiac Serv., 730 F.2d at 638 ("[T]he presence of a definite maturity date and a definite obligation to repay is a highly significant feature of a debtor-creditor relationship.").  Yet, each note expressly states that the "[p]rincipal balance plus accrued interest shall be due and payable five (5) years from the date" of execution.  The notes do provide a contingency: in the event of non-payment within five years, full repayment is due upon the release of the certificates of deposit.  But a contingency—even one anticipated as likely by the parties—does not render an otherwise definite deadline illusory for the purposes of this analysis.  Similarly, concerning the fourth factor, the notes give Mr. Jenkins the right to enforce payment after five years.  Stinnett's Pontiac Serv., 730 F.2d at 639 ("If a fixed obligation to repay the advances exists, the transaction appears to be a loan.").  The fact that he did not exercise this contractual right does not render it meaningless.

Concerning the eighth factor, AFI's undercapitalization, we have held that placing too heavy an emphasis on undercapitalization in our recharacterization analysis would create an "unhealthy deterrent effect," causing business owners to fear that, should their "rescue efforts" fail, a court will "give disproportionate weight to the poor capital condition of their failing companies and thus too quickly refuse to treat their cash infusions as loans." In re Hedged-Investments, 380 F.3d at 1298 n.1. Given the not insubstantial sum of money Mr. Jenkins paid for his interest in AFI and for his subsequent "rescue efforts," it is unsurprising that he would seek notes in return. Also, while no one disputes AFI was inadequately capitalized to engage in coal mining, as the dissent highlights, AFI was not engaged in coal mining. Instead, its business was to fulfill reclamation obligations to the State of Missouri.

The seventh factor looks to the intent of the parties—specifically, whether the parties intended the transactions to be loans. In re Hedged-Investments, 380 F.3d at 1299. The bankruptcy court found that Mr. Jenkins never intended the loans to be repaid by AFI. In re Alternate Fuels, Inc., 2012 WL 6110429, at *11. Yet, this finding appears to be informed by the misconceptions outlined above—specifically that, because the amounts of the notes were not directly related to Mr. Jenkins' transfer to AFI, they lacked adequate consideration and "did not evidence loans in the traditional sense." Id. Even if, as the bankruptcy court found, the notes served to "secure [Mr.] Jenkins' investments in AFI and

- 23 -

Cimarron," id., and even if Mr. Jenkins did not subjectively believe that AFI could repay the principal and interest from its own funds within five years, the evidence indicates that he intended the notes to be satisfied pursuant to their second clause: "upon reclamation bond release by the State of Missouri."[5] Thus, the court's finding cannot stand.

Certainly, the Trustee is correct that some of the <u>Hedged-Investments</u> factors favor recharacterization. Most notably, the eleventh factor analyzes the ability of the corporation to obtain loans from outside lending institutions. "When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." <u>In re AutoStyle Plastics</u>, 269 F.3d at 752. Here, despite Mr. Jenkins' efforts to secure outside funding, AFI was unable to obtain any other loans. And the thirteenth factor considers the failure of the debtor to repay on the due date or to seek a postponement. AFI did not pay the notes by their five-year maturity dates and did not seek an extension.

---

[5] Similarly, concerning the third "source of payments" factor, even if Mr. Jenkins did not expect AFI itself to provide an independent source of payment, he expected the release of the certificates of deposit to satisfy the second clause of the notes. In our estimation, this factor does not require recharacterization because the evidence is abundantly clear that Mr. Jenkins expected repayment of debt in accordance with the terms of the notes, rather than to infuse capital. The security arrangements, including the certificates of deposit and assignment of the <u>Cabanas</u> suit proceeds, <u>supra</u> n.4, do not detract from this. Each potential source of repayment had its own risks; for example, though assigned to Mr. Jenkins, the proceeds of the release of the certificates of deposit were contingent upon completion of the reclamation.

However, despite factors supporting recharacterization, we exercise caution in this arena. We have previously declined to hold broadly that "a dominant shareholder may not loan money to a corporation in which he is the principal owner and himself become a secured creditor." In re Mid-Town Produce Terminal, Inc., 599 F.2d 389, 392 (10th Cir. 1979). We have been careful not to "discourage owners from trying to salvage a business" by requiring "all contributions to be made in the form of equity capital." Id. Indeed, owners may often be "the only party willing to make a loan to a struggling business," In re Dornier Aviation, 453 F.3d at 234, and needlessly punishing their efforts is neither "desirable as social policy" nor required by our precedent. In re Mid-Town Produce, 599 F.2d at 392.

Although we agree on many key points, the dissent does not view Mr. Jenkins' as that of a shareholder loaning money "to keep a struggling business afloat in hopes that it might later make money." Dis. Op. 1. Thus, according to the dissent, much of our analysis is skewed by inapplicable policy considerations. Id. at 12. Yet, the parties agree that Mr. Jenkins advanced funds to AFI in order to help the failing company complete reclamation, a goal it could not meet without his help. The simple fact is that the reclamation of land, for which a plan is required during the initial permitting stage, is as integral to a mining business

as the mining of coal.[6]  In any event, we decline to question the value of any

particular endeavor.  We are not empowered to pick winners and losers based

upon our view of the social utility of their underlying business.

The dissent also relies heavily on the source of repayment for the loans

which provided operating funds.  But the promissory notes were to be repaid by

AFI when the payments were due: after five years or, at the latest, upon

completion of reclamation.  That the payment ultimately was secured by the

certificates of deposit or by the Cabanas judgment does not allow us to recast debt

into a capital infusion.

Thus, considering all of the Hedged-Investments factors under the unique

circumstances of this case, we believe on balance that recharacterization of Mr.

Jenkins' advances as capital contributions is not warranted.


II.     Mr. Jenkins' Claim Does Not Fail for Insufficient Proof

Mr. Jenkins also contests the bankruptcy court's alternative holding

discharging Mr. Jenkins' claim because he failed to meet his burden of persuasion

as to its amount.  When a Trustee objects to a proof of claim, the creditor carries

the burden of persuasion as to the validity and amount of the claim.  In re

---

[6]  Further, we will not presume that, at the time of Mr. Jenkins' transfers, AFI was a "moribund business" because it was engaged in reclamation.  Dis. Op. 13 n.3.  The future is full of uncertainties.  One such uncertainty was the recovery on a judgment.

- 26 -

Harrison, 987 F.2d 677, 680 (10th Cir. 1993). The bankruptcy court found that Mr. Jenkins did not provide sufficient information to prove the amount of his claim because "neither the attachments to the proof of claim nor the trial evidence is sufficient for the Court to determine the amount owed to the Jenkinses, if their transfers to AFI are not recharacterized as equity." In re Alternate Fuels, Inc., 2012 WL 6110429, at *17.

Yet, Mr. Jenkins attached to his claim valid copies of the three promissory notes comprising his claim, as well as a copy of the assignment of the Cabanas suit proceeds. Both the Trustee and the bankruptcy court accepted the facial terms of the notes and assignment, and the Trustee has not argued that Mr. Jenkins' interest calculations are inaccurate. The Trustee focuses again on whether Mr. Jenkins' advances to AFI directly correlate to the note amounts, Aplee. Br. 47, but such an inquiry is not necessary. Because, as discussed above, we decline to recharacterize the underlying transfers as equity rather than debt, the amount of AFI's indebtedness to Mr. Jenkins under the notes is crystal clear.

The dissent points out that, in concluding Mr. Jenkins did not sustain his burden of proof as to the validity and amount of his claim, the bankruptcy court did not address its status as a secured claim. This issue was not raised directly by the parties,[7] and we decline to venture off-brief to address arguments the parties

---

[7] Thus, the Trustee merely repeats arguments about the validity and amount of the notes that we have rejected. Aplee. Br. 47.

have not presented or provide relief the parties have not requested. <u>In re C.W. Mining Co.</u>, 625 F.3d 1240, 1246 (10th Cir. 2010); <u>see</u> Fed. R. App. P. 28(a)(5)–(9).

## III.     <u>Equitable Subordination is Not Appropriate</u>

Finally, the Trustee argues that, if Mr. Jenkins' transactions are not recharacterized as equity and his alleged secured claim is allowed to proceed, it should nevertheless be equitably subordinated. Aplee. Br. 48. Equitable subordination, like recharacterization, presents a mixed question of fact and law. <u>In re Hedged-Investments</u>, 380 F.3d at 1300. We review the bankruptcy court's factual findings for clear error, and we review the court's application of the legal test for equitable subordination de novo. <u>Id.</u>

Section 510(c) of the Bankruptcy Code governs equitable subordination:

[A]fter notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). Under the doctrine of equitable subordination, a court looks to the behavior of the parties involved. If fairness so requires, "[t]he funds in question are still considered outstanding corporate debt," but a court "postpon[es]

- 28 -

the subordinated creditor's right to repayment until others' claims have been satisfied." In re Hedged-Investments, 380 F.3d at 1297 (citing In re Mid-Town Produce, 599 F.2d at 393–94).

We note that equitable subordination is an extraordinary remedy to be employed by courts sparingly. "Wrongful or unpredictable subordination spawns legal uncertainty of a particular type: the risk that a court may refuse to honor an otherwise binding agreement on amorphous grounds of equity." In re Lifschultz Fast Freight, 132 F.3d 339, 347 (7th Cir. 1997).

The Tenth Circuit requires three conditions for a court to exercise its equitable subordination power: "(1) 'inequitable conduct' on the part of the claimant sought to be subordinated; (2) injury to the other creditors of the bankrupt or unfair advantage for the claimant resulting from the claimant's conduct; and (3) consistency with the provisions of the Bankruptcy Code." In re Hedged-Investments, 380 F.3d at 1300. We place "special emphasis" on whether inequitable conduct has occurred, id. at 1300, and recognize three categories of such conduct: "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego," id. at 1301 (quoting In re Fabricators, Inc., 926 F.2d 1458, 1467 (5th Cir. 1991)). A majority of courts have described the degree of inequitable conduct warranting subordination as "gross and egregious, tantamount to fraud,

misrepresentation, overreaching or spoliation, or involving moral turpitude." In re Eufaula Indus. Auth., 266 B.R. 483, 489 (B.A.P. 10th Cir. 2001).

If a claimant is an "insider" or a "fiduciary" of the debtor, our analysis is less stringent. "[T]he party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider." In re Hedged-Investments, 380 F.3d at 1301. Here, the bankruptcy court classified Mr. Jenkins as an insider who exercised complete control over AFI throughout the relevant period. In re Alternate Fuels, Inc., 2012 WL 6110429, at *14. Mr. Jenkins argues that he delegated all of AFI's day-to-day operations to Mr. Pommier, and, therefore, he was not an insider; thus, the less stringent insider standard of unfair conduct does not apply. Aplt. Br. 61–63. We need not determine Mr. Jenkins' status as an insider or non-insider because, under either equitable subordination standard, the court erred in finding that Mr. Jenkins engaged in unfair or inequitable conduct.

First, the Trustee did not argue, and the bankruptcy court did not find, that Mr. Jenkins engaged in any fraud or illegality when obtaining the three notes or taking the assignment of the Cabanas judgment proceeds. Instead, the court held that Mr. Jenkins "breached his fiduciary duties by repeatedly and convincingly stating that his purpose when operating AFI was to secure the release of the Certificates of Deposit for his personal benefit." In re Alternate Fuels, Inc., 2012 WL 6110429, at *14. Even if Mr. Jenkins owed fiduciary duties to AFI, which

- 30 -

Mr. Jenkins contests, Aplt. Br. 62–63, helping AFI fulfill obligations owed to the State of Missouri does not constitute a breach of those duties. Indeed, at the time Mr. Jenkins purchased AFI, it was no longer engaged in active mining operations, and its only pursuit was to reclaim permitted lands.

Furthermore, the court did not find that Mr. Jenkins controlled AFI as an instrumentality or mere alter ego, and the Trustee's argument to the contrary is unpersuasive. We decline to hold broadly that a company becomes the alter ego of its majority shareholder simply because that shareholder funds a project that will ultimately benefit him. And, although AFI was thinly capitalized, "undercapitalization is not in itself inequitable conduct." In re Hedged-Investments, 380 F.3d at 1302 (quoting In re Lifschultz Fast Freight, 132 F.3d at 345). A dearth of capital resources increases risk for a lender, but the lender typically will have adequate information about such risk unless "trickery"—such as the "exploitation of secret information or misrepresentation of the borrower's financial health"—upsets ordinary market forces. Id. at 1302–03.

Applying the less stringent insider standard, the bankruptcy court highlights several of Mr. Jenkins' specific actions as unfair. Although perhaps atypical, none of these acts are "unfair." For example, Mr. Jenkins arranged for a straw man to hold his interest in AFI because he was listed in the Applicant Violator System (AVS) of the federal Office of Surface Mining, Reclamation, and Enforcement and therefore blocked from being an owner or operator of a coal

mining operation in the United States. Yet, Mr. Pommier conceded that Mr. Jenkins' AVS status would not have actually prevented or in any way affected his purchase of AFI, since he did not intend to "operate" the mining business but simply complete reclamation. Additionally, Mr. Jenkins only adopted the straw arrangement upon Mr. Pommier's advice. IV Aplt. App. 645.

The court also noted that Mr. Jenkins failed to account for certain sales of AFI's or Cimarron's assets. In re Alternate Fuels, Inc., 2012 WL 6110429, at *14. Mr. Pommier alleges that Mr. Jenkins pocketed the sales proceeds, and the court found that Mr. Jenkins did not adequately refute this conclusion. Instead, it held that Mr. Jenkins "probably retained the proceeds for his own benefit" without applying a credit to the notes. Id. at *5. Given that the court found neither Mr. Pommier nor Mr. Jenkins' testimony to be reliable and the record evidence does not provide clarity, a claim of even "probable" unfair conduct should not serve as the basis for the extreme remedy of equitable subordination.

Furthermore, the court relied heavily on its recharacterization analysis in holding that Mr. Jenkins acted unfairly. The court highlighted that Mr. Jenkins' "'loans' to AFI were in fact substitutions for equity or risk capital." Id. at *14. As discussed above, we hold that Mr. Jenkins' loans to AFI were indeed loans; thus, he did not act unfairly when executing the promissory notes. In fact, AFI would not have been able to complete reclamation without the funds advanced by Mr. Jenkins. Similarly, the assignment of the Cabanas judgment was not

inequitable, since the assignment was valid, enforceable, and supported by consideration.

For the foregoing reasons, we REVERSE the bankruptcy court's judgment. Neither recharacterization nor equitable subordination is appropriate under these circumstances, and Mr. Jenkins has satisfied his burden of proof as to the validity and amount of his claim.

No. 14-3086, *Redmond v. Jenkins*

**PHILLIPS**, Circuit Judge, dissenting:

I would affirm the bankruptcy court's decision to recharacterize the loans as equity. Absent our doing that, I would remand the question of whether Mr. Jenkins has a valid security agreement against the *Cabanas* litigation proceeds. Because we do not remand that question, I explain why I believe the existing record does not support a finding that Mr. Jenkins has a secured claim.

## I.  Recharacterization

I begin by recognizing a simple fact: Mr. Jenkins was not funding Alternate Fuels, Inc. (AFI) to keep a struggling business afloat in hopes that it might later make money. Instead, for his financial benefit and not AFI's, he funded AFI solely so that it could meet its obligation to reclaim coal lands in accordance with its promise to the State of Missouri. In short, by buying AFI, Mr. Jenkins made a business gamble—he bet that he would spend less helping AFI reclaim the coal land than he would make from his collecting 24 certificates of deposit worth about $1.4 million that he had bought from AFI's previous owner, Mr. Warmack, who had pledged the certificates of deposit against the reclamation bonds. *See In re Alternate Fuels, Inc.*, Bankr. No. 09-20173, 2012 WL 6110429, at *3 n.6 (Bankr. D. Kan. Dec. 10, 2012) (unpublished) ("*In re Alternate Fuels I*"). Also as part of his business calculation, Mr. Jenkins knew that by buying AFI he was also obtaining Cimarron's equipment (of which his purchased share was 99%) worth

between one and two million dollars. *See In re Alternate Fuels, Inc.*, 507 B.R. 324, 328–29 (B.A.P. 10th Cir. 2014) ("*In re Alternate Fuels II*").

As noted in *In re Hedged-Investments Assocs. Inc.*, 380 F.3d 1292, 1297 (10th Cir. 2004), when a bankruptcy court recharacterizes a loan, it "effectively ignore[s] the label attached to the transaction at issue and instead recognize[s] its true substance."[1] The effect is that "[t]he funds advanced are no longer considered a loan which must be repaid in bankruptcy proceedings as a corporate debt, but are instead treated as a capital contribution." *Id*. In evaluating whether "funds advanced to a now-bankrupt entity were true loans or camouflaged equity investments," we consider a nonexclusive list of thirteen factors:

(1) the names given to the certificates evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date;

(3) the source of payments;

(4) the right to enforce payment of principal and interest;

(5) participating in management flowing as a result;

(6) the status of the contribution in relation to regular corporate creditors;

(7) the intent of the parties;

(8) "thin" or adequate capitalization;

(9) identity of interest between the creditor and stockholder;

---

[1] For all reasons advanced in the majority opinion, I agree that *In re Hedged-Investments* remains good law even after the decisions in *Travelers Cas. & Surety Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007), and *Law v. Siegel*, 134 S. Ct. 1188 (2014).

(10) source of interest payments;

(11) the ability of the corporation to obtain loans from outside lending institutions;

(12) the extent to which the advance was used to acquire capital assets; and

(13) the failure of the debtor to repay on the due date or to seek a postponement.

*Id.* at 1298 (citing *Stinnett's Pontiac Serv., Inc. v. Comm'r of Internal Revenue*, 730 F.2d 634, 638 (11th Cir. 1984)).

Both the bankruptcy court and the Bankruptcy Appellate Panel weighed these factors under the facts of this case and determined that Mr. Jenkins's loans should be recharacterized as equity investments. *See In re Alternate Fuels II*, 507 B.R. at 327. The majority disagrees with their analyses, reweighing the factors and concluding that Mr. Jenkins made loans and not equity investment. Because I believe that the bankruptcy court more properly applied the *Hedged-Investments* factors and better followed the case's underlying policies, I would affirm the bankruptcy court's decision recharacterizing the loans as equity.

In evaluating the thirteen factors, I note that they fall into two general categories—first, whether the transaction documents signal debt; second, if so, whether the loans are really just disguised equity investments. Thus, I break the 13 factors into these two categories and consider where the factors point. After doing so, I conclude that the bankruptcy court was correct to recharacterize the loans as equity investment. Further, after considering the factors and the underlying facts of this case, I disagree with the majority's decision to treat Mr. Jenkins as a business owner who was trying to nurse a struggling business back to survival and profitability. That presents a mistaken view that

3

diverts the analysis in the wrong direction, miscasting Mr. Jenkins in a role unfitting him here—as an owner trying to help his business survive during a tough time. When such a business owner brings a case to us, we can consider it under our 13 factors independently of whatever result we reach for Mr. Jenkins based on his far different circumstances.

1. Is there an appearance of debt?

    a. *Factor 1: The names given to the certificates evidencing the indebtedness*

I agree with the majority that this factor weighs in favor of a finding of debt. The names of the instruments evincing debt (promissory notes) "are plainly instruments of indebtedness." Maj. Op. at 18. I also agree that this remains so despite the parties not completing all portions of the preprinted promissory-note forms. *Id*. Moreover, contrary to the Bankruptcy Appellate Panel, I agree with the majority that the notes are not rendered invalid merely because they "roughly reflect" the advances that Mr. Jenkins made. Maj. Op. at 19. I disagree with the bankruptcy court's view that, because AFI had no realistic ability to pay the debt on the first three notes, this factor only superficially favors loans and not equity. The name "promissory notes" suggests indebtedness. This factor does not set an onerous standard, and Mr. Jenkins meets it.

    b. *Factor 2: The presence or absence of a fixed maturity date*

I agree with the majority that the notes set a fixed maturity date, *see* Maj. Op. at 22, but for a slightly different reason. I believe that the notes require payment *no later than* five years after their execution. That the payment might become fully due "upon reclamation bond release" or, with the fourth note, also "upon . . . proceeds from

4

lawsuit," contemplates possible payment before five years have passed from execution of the notes. Supporting this view that the two contingencies did not indeterminately extend the due date past five years, I read the contingencies as being consistent with the fourth note's direction that the "[p]rincipal balance plus accrued interest shall be due and payable on *or before* five (5) years from the date shown above. . . ." Appellants' App., vol. VI, at 1151 (emphasis added).

### c. Factor 4: The right to enforce payment of principal and interest

I agree with the majority that Mr. Jenkins had a right to enforce payment on his notes regardless of whether AFI had any assets. In my view, as in the majority's, it is unimportant under this factor that Mr. Jenkins did not exercise his contractual right to enforce payment when it became due. Maj. Op. at 22. I agree with the majority that "[t]he fact that he did not exercise this contractual right does not render it meaningless." *Id*. In my view, the bankruptcy court confuses Mr. Jenkins's "right" to enforce payment with his "ability" to do so. Because the factor does not ask about the debtor's ability to pay, the bankruptcy court erred by discounting this factor because in its view the "right was illusory." *In re Alternate Fuels I*, 2012 WL 6110429, at *11.

2. <u>Is there a reality of debt based on the conduct, knowledge, and intent of the parties?</u>

### a. Factor 3: The source of the payments

The majority does not discuss this factor. The bankruptcy court does though, concluding that it "strongly indicates a capital infusion." *Id.* at *11. "The question is whether the lender has any reasonable expectation of payment if the business fails." *In re*

5

*Lexington Oil & Gas Ltd., Co.*, 423 B.R. 353, 366 (Bankr. E.D. Okla. 2010). In evaluating this question, the bankruptcy court found that AFI "had no business other than the completion of reclamation," which reclamation "would not generate revenue for AFI, but it would result in the release of the Certificates of Deposit which were assigned to the Jenkinses and were looked to by the parties as the source of payment of the Notes." *In re Alternate Fuels I*, 2012 WL 6110429, at *11. When we eliminate the certificates of deposit as a source of repayment of the three loans because they already belonged to Mr. Jenkins, no source of repayment remained. In that setting, I agree with the bankruptcy court that this factor favors a finding of investment equity and not loans.

  b. *Factor 5: Participation in management flowing as a result*

Because Mr. Jenkins did not increase his participation in management because of the asserted debt AFI owed on the promissory notes, the majority contends that this factor favors Mr. Jenkins and a finding of loans. I am unpersuaded. We must remember that Mr. Jenkins owned one-hundred percent of AFI and could manage it as he pleased. I cannot see how his inability to manage it beyond one-hundred percent favors either side's argument. In that situation, I say this factor is neutral and favors neither side.

  c. *Factor 6: The status of the contribution in relation to regular corporate creditors*

The majority ignores this factor, and the bankruptcy court deemed it irrelevant. *See id.* at *10. I do not weigh it in favor of either party.

6

### d. *Factor 7: The intent of the parties*

Although not directly saying so, the bankruptcy court appears to have weighed this factor in favor of investment equity and not loans. It found that "Jenkins never intended the loans to be paid by AFI." *Id.* at \*11. This sounds like a finding of fact subject to the clear error standard. *See In re Blinder, Robinson & Co., Inc.*, 124 F.3d 1238, 1241 (10th Cir. 1997). And because AFI lacked any prospect of ever obtaining any assets when the first three notes were signed, I disagree with the majority that the bankruptcy court erred in its finding. *See* Maj. Op. at 23–24. Indeed, the bankruptcy court bolstered its finding by quoting Jenkins's own stipulation that the "real purpose of the [three Notes] . . . was to secure Jenkins['s] investments in AFI and Cimarron." *In re Alternate Fuels I*, 2012 WL 6110429, at \*6. I gather that the bankruptcy court reads this as saying that Jenkins's three notes served solely to doubly-ensure that his personally-owned certificates of deposit were safe from AFI's many creditors. That reading is also consistent with Mr. Pommier's testimony that, "if Mr. Jenkins received the proceeds of the release of the certificates of deposit upon the completion of reclamation, AFI would owe no money on the note." Maj. Op. at 5 (citing Appellant's App., vol. IV, at 697).

But here the majority takes a different view, saying that "the evidence indicates that [Jenkins] intended the notes to be satisfied pursuant to their second clause: 'upon reclamation bond release by the State of Missouri.'" Maj. Op. at 24. If the majority is suggesting that the notes were to be repaid from the $1.4 million of certificates of deposit, it fails to explain why Mr. Jenkins would repay himself from his personally

7

owned certificates of deposit. And if the majority indeed reads this promissory-note language as requiring repayment *from* the certificates of deposit, the bankruptcy court on remand should first apply the $1.4 million against Mr. Jenkins's proof of claim before looking to AFI's other assets.[2]

The fourth note incorporates and cumulates the principal and interest owed on the first three notes. But any debt owed on the first three notes was old debt. While the bankruptcy court and majority agree that consideration (the promise to provide further funds to reclaim the coal property) supported the fourth note, I believe that consideration would support only a loan for newly lent money, not for money already lent and spent. Before I could agree that Mr. Jenkins can so easily cut ahead of AFI's other creditors, I would need to see some legal justification allowing it. Absent that, I believe the intent of the parties favors a finding that the loans in reality were equity investment.

### e. Factor 8: "Thin" or inadequate capitalization

The majority finds "no support" for the bankruptcy court's conclusion that this factor favored recharacterization. Maj. Op. at 21. Instead, the majority suggests that the bankruptcy court placed too heavy an emphasis on undercapitalization in using this factor to favor recharacterization. *See* Maj. Op. at 23. No one disputes that AFI was inadequately capitalized to engage in coal mining. Its lack of capital or any other assets certainly made any repayment unrealistic. I agree with the majority that heavily

---

[2] Mr. Jenkins sought outside lending to fund the reclamation, but no outside lenders were willing to lend money. Had an outside lender been found, it would have made sense that its promissory note would have included the certificates of deposit as collateral. Whether the promissory notes here are a vestige of that earlier lending attempt is unknown from the record.

8

emphasizing "undercapitalization in our recharacterization analysis would create an 'unhealthy deterrent effect,' causing business owners to fear that, should their 'rescue efforts' fail, a court will 'give disproportionate weight to the poor capital condition of their failing companies and thus too quickly refuse to treat their cash infusions as loans.'" Maj. Op. at 23 (quoting *In re Hedged-Investments*, 380 F.3d at 1298 n.1). But that concern simply does not apply here. In a case like the majority describes, I would wholeheartedly agree to discount this factor. In a case like this one, however, where Mr. Jenkins was in no way seeking to "rescue" AFI, it is wrong to underemphasize this factor for him because it might weigh too heavily against others unlike him. I agree with the bankruptcy court that this factor favors a finding of investment equity and not debt.

### f. Factor 9: Identity of interest between the creditor and stockholder

The majority again finds "no support" for the bankruptcy court's reliance on this factor to support investment equity instead of loans. Maj. Op. at 21. While agreeing that "this factor may indicate a capital contribution when two or more shareholders own debt in the same proportion as their underlying equity interests," the majority declares that "the same reasoning does not automatically apply when a single shareholder owns the entirety of a company's stock." *Id*. Because Mr. Jenkins owns 100% of AFI and provided all funds to it, I agree with the bankruptcy court that "[a]n equity contribution is indicated." *In re Alternate Fuels I*, 2012 WL 6110429, at \*12.

### g. Factor 10: Source of interest payments

The majority is silent on this factor, and the bankruptcy court deemed it irrelevant because AFI paid no interest payments. *Id.* at \*10. I believe it favors neither party.

9

*h. Factor 12: The extent to which the advance was used to acquire capital assets*

The bankruptcy court says that this factor superficially weighs in favor of a loan because Mr. Jenkins's money was used to fund operating expenses and not to acquire capital assets. *Id.* at *10. It gives this factor "reduced significance" because AFI in reclamation-mode had only operating expenses and did not acquire capital assets. *Id.* Even so, the factor itself does not delve into the reasons a business expends funds one way or the other—it simply asks how they were spent. Because the funds here were spent on operating expenses, I agree with the majority that this factor weighs in favor of debt, although not nearly so much as in an ordinary ongoing-business situation.

Finally, this brings us to two factors the majority concedes support the bankruptcy court's view that the Jenkins loans were equity investment and not loans.

*i. Factor 11: The ability of the corporation to obtain loans from outside lending institutions*

The majority notes that Mr. Jenkins tried and failed to obtain loans from outside lending institutions on behalf of AFI. Maj. Op. at 23. It further observes that "[w]hen there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." Maj. Op. at 24 (quoting *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 752 (6th Cir. 2001)). In view of AFI's financial condition, Mr. Jenkins's failure to find outside lenders was hardly a surprise. This factor supports the bankruptcy court's decision recharacterizing Mr. Jenkins's loans as investment equity.

10

*j. Factor 13: The failure of the debtor to repay on the due date or to seek a postponement*

The majority agrees that this factor favors recharacterization because "AFI did not pay the notes by their five-year maturity dates and did not seek an extension." Maj. Op. at 24. Again, it is not just the failure to pay that weighs in favor of investment equity and against loans. It is also *why* AFI did not pay. Quite simply, AFI had no ability to pay the debts when due, and Mr. Jenkins knew when he wrote the promissory notes that this would happen. Again, this factor supports the bankruptcy court's decision to recharacterize the loans as investment equity.

3. <u>Considering the 13 Factors as a Whole</u>

By my count, seven factors weigh in favor of recharacterization of the loans as investment equity, three factors in favor of treating the loans as debt, and three factors as neutral. Those factors favoring Mr. Jenkins largely concern the name and form of the promissory notes, and those against him concern the real-world backdrop behind the notes. Despite Mr. Jenkins's promissory-note forms suggesting debt, little else does. Mr. Jenkins entirely owned AFI and had it sign promissory notes it could not pay or hope to pay. Unlike with arms-length promissory notes, the object was not repayment, but instead was to protect Mr. Jenkins's 24 certificates of deposit from AFI's creditors and later to elevate his claims under the notes to a secured status. On balance, under these circumstances, the *Hedged-Investments* factors support the bankruptcy court's recharacterization of the loans as investment equity.

11

In concluding otherwise, the majority relies on a policy of encouraging (or at least not discouraging) hypothetical business owners—unlike Mr. Jenkins—who lend their businesses money to keep them running in hopes of future profits. In this regard, the majority urges caution on grounds that "[w]e have been careful not to 'discourage owners from trying to salvage a business' by requiring 'all contributions to be made in the form of equity capital.'" Maj. Op. at 25 (quoting *In re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389, 392 (10th Cir. 1979)). Similarly, it notes that "[i]ndeed, owners may often be 'the only party willing to make a loan to a struggling business,' *In re Dornier Aviation* [*(North America), Inc.*], 453 F.3d [225,] 234 [(4th Cir. 2006)], and needlessly punishing their efforts is neither 'desirable as social policy' nor required by our precedent. *In re Mid-Town Produce*, 599 F.2d at 392." Maj. Op. at 25.

While those are sensible policies in those sorts of cases, this case does not fit that bill. Here, Mr. Jenkins was in no way lending to sustain or revive a struggling business. Giving him the benefit of policies assuming that he was doing so skews the *Hedged-Investments* analysis. Thus, I disagree with the majority that the "unique circumstances of this case" justify treating Mr. Jenkins's money advances as loans under *Hedged-Investments*. Maj. Op. at 26. Instead, I believe that the actual circumstances here (Mr. Jenkins's advancing AFI money not to mine coal but instead to reclaim coal lands so Mr. Jenkins could obtain release of his certificates of deposit) favor recharacterizing the loans as equity investment.[3]

---

[3] I do not agree with the majority that any of my analysis would mean that we are "empowered to pick winners and losers based upon our view of the social utility of their

12

**II. Security Agreement**

Although not elaborating, the bankruptcy court concluded that Mr. Jenkins has "not sustained [his] burden of proof as to the validity and amount of [his] claims." *In re Alternate Fuels I*, 2012 WL 6110429, at *18. The Trustee had objected to Mr. Jenkins's claim, arguing that "[t]he Jenkins Claim lacks sufficient documentation or proof of a valid claim (i) in the amount of the claim asserted; (ii) the consideration received by AFI; and/or (iii) the secured nature of the claim asserted." Appellants' App., vol. 1, at 182.[4] Unfortunately, the bankruptcy court did not explain in any detail whether or how Mr. Jenkins's alleged "security" interest in AFI's judgment proceeds was sufficient or insufficient. Unlike the majority, I believe that, by contesting the claim in these terms, the Trustee raised the issue sufficiently for us to consider the validity of the claimed security interest.

I doubt whether any of Mr. Jenkins's four promissory notes established a security agreement under Kansas law, and accordingly I doubt whether he can jump ahead of AFI's unsecured creditors' claims totaling about $5.7 million. Rather than decide the issue on appeal, I believe we should remand for the bankruptcy court to reach a reasoned

underlying business." Maj. Op. at 26. Few would doubt the social utility of reclaiming lands used for coal mining. Instead, what the analysis suggests is that a business owner funding a struggling business is more apt to intend to seek repayment on his advanced funds than a business owner like Mr. Jenkins who lent money to an otherwise moribund business with his own independent financial incentive without hope of the moribund business ever paying him back.

[4] The bankruptcy court referenced the objection on the three bases asserted by the Trustee. *Alternate Fuels I*, 2012 WL 6110429, at *17.

decision on the issue, a decision we could later more meaningfully review. Because the majority prefers to press ahead, I will simply note my concerns and their bases.

"Before a security interest may be enforced against the debtor, certain formal requirements must be met."[5] *Maxl Sales Co. v. Critiques, Inc.*, 796 F.2d 1293, 1297 (10th Cir. 1986) (applying Kansas law to determine whether a creditor in a bankruptcy proceeding had a secured interest). First, the debtor must have signed a written security agreement "that provides a description of the collateral." Kan. Stat. Ann. § 84-9-203(b)(3)(A). Second, the creditor must give value. *Id.* § 84-9-203(b)(1). Third, the debtor must have rights in the collateral. *Id.* § 84-9-203(b)(3)(A). Here, a remand would help us tell whether these conditions are met. Because the majority reverses the bankruptcy court's holding that the loans should be recharacterized as investment equity and not debt, the unsecured creditors have a great interest in knowing whether AFI is a secured or unsecured creditor.

In my view, based on the record, the fourth promissory note likely does not meet the requirements of a security agreement under Kansas law. I note that Mr. Jenkins did not even include this "renewal" note as part of his proof of claim. Nor do I see why he would

---

[5] Section 101 of the Bankruptcy Code defines "security agreement" (agreement that creates or provides for a security interest), "security interest" (lien created by agreement), and "lien" (charge against or interest in property to secure payment of a debt or performance of an obligation). 11 U.S.C. § 101(50), (51), and (37), respectively. The definitions section of the Kansas secured transactions statutes defines "secured party" as a "person in whose favor a security interest is created or provided for under a security agreement, whether or not any obligation to be secured is outstanding." Kan. Stat. Ann. § 84-9-102(a)(71)(A). And it has the same definition for "security agreement" as the Bankruptcy Code. *Id.* § 84-9-102(a)(72).

14

have done so—in my view, the fourth promissory note does not describe as collateral either the *Cabanas* lawsuit's possible judgment proceeds or the $3 million *Cabanas* lawsuit assignment. Instead, as I read its terms, the renewal note simply adds an additional time before five years have elapsed at which payment might become due. By my reading, the note sets an outer limit of five years in which to pay, and provides two possible earlier payment due dates—"upon reclamation bond release by the State of Missouri" or "upon . . . proceeds from the [*Cabanas*] lawsuit. . . ." This fourth note (March 1, 2003) contains the stock language of the three earlier notes, but it adds the language I italicize below:

> Principal balance plus accrued interest shall be due and payable on or before five (5) years from the date shown above at Route 2 Box 97 Adrian, Missouri 64720. This note shall be paid in full upon reclamation bond release from the State of Missouri *or proceeds from lawsuit filed in Federal Court case no 02CV1182* said bonds currently being used to secure reclamation liability for Alternate Fuels, Inc. at the Blue Bound Mine.

Appellants' App., vol. VI, at 1151 (emphasis added).

I cannot see how this language creates a security interest in "collateral" of the certificates of deposit or of assignment of the *Cabanas* lawsuit proceeds. First, for the certificates of deposit, any such reading would make no sense. As the majority notes, Mr. Jenkins, and not AFI, personally owns the $1.4 million dollars in certificates of deposit. Maj. Op. at 5. Surely AFI was not to pay its substantial debt to Mr. Jenkins from his own property. Second, as with the certificates of deposit, this language does not say that Mr. Jenkins is entitled to repayment *from* the "proceeds from lawsuit." Instead, Mr. Jenkins's note—and we should remember he wrote it—provides that the note was due *upon*

15

"proceeds from lawsuit." In my view, Mr. Jenkins's word choice of "upon" instead of "from" fails to identify collateral in a security agreement. Instead, it simply identifies an alternative, earlier moment in time when payment might become due.

Nor does the 2003 renewal note identify as collateral the $3 million assignment AFI made to Mr. Jenkins that same day. Similarly, the assignment does not mention the renewal note. This complicates any effort to combine the two instruments to fashion or find a security interest in the identified collateral. I see nothing in any promissory note describing collateral sufficiently to satisfy Kan. Stat. Ann. § 84-9-203(b)(2).

Because the 2003 renewal note and the *Cabanas* assignment are distinct, Mr. Jenkins must attempt to recover from them separately. Even with the majority's decision not to recharacterize the loans as equity, Mr. Jenkins still should be left to recover from his promissory notes as part of the group of unsecured creditors. As for the *Cabanas* lawsuit assignment, "[t]he general rule is that an assignee of a nonnegotiable chose in action acquires no greater right than was possessed by his assignor, and simply stands in the shoes of the latter." *Carson v. Chevron Chem. Co.*, 635 P.2d 1248, 1260 (Kan. Ct. App. 1981); *see also* 6 Am. Jur. 2d. Assignments, § 108 (2d ed. 2015) ("As a general rule, an assignee takes the subject of the assignment with all the rights and remedies possessed by or available to the assignor."). For these reasons, I respectfully dissent.